[Cite as *State v. Percy*, 2017-Ohio-1224.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
LUCAS COUNTY

State of Ohio                                            Court of Appeals No. L-16-1060

    Appellee                                      Trial Court No. CR0201501618

v.

Terrance Percy                                      **DECISION AND JUDGMENT**

    Appellant                                      Decided:  March 31, 2017

* * * * *

Julia R. Bates, Lucas County Prosecuting Attorney, and
Claudia A. Ford, Assistant Prosecuting Attorney, for appellee.

Tim A. Dugan, for appellant.

* * * * *

**SINGER, J.**

{¶ 1} Appellant, Terrance Percy, appeals from the March 24, 2016 judgment of

the Lucas County Court of Common Pleas sentencing him to seven years of

imprisonment following his conviction by a jury of felonious assault, a violation of R.C.

2903.11(A)(1). For the reasons which follow, we affirm.

**{¶ 2}** On appeal, appellant asserts the following assignments of error:

1) Appellant received ineffective assistance of Counsel as guaranteed by the Sixth Amendment to the United States Constitution and Article 1, Section 10 of the Ohio Constitution.

2) Appellant's conviction fell against the manifest weight of the evidence.

**{¶ 1}** The following evidence was admitted at trial. The victim recalled leaving the Paris bar and walking along East Broadway Street toward his home in the early morning hours of April 4, 2015, after having drank less than a 12 pack over a five-hour period. He and his roommate testified appellant had been asked to leave the bar because the bartender thought he was fighting with a friend. His roommate offered to give him a ride, but for some reason the victim rejected the ride and walked home.

**{¶ 2}** When he was near Nevada Street, the victim saw two men attacking a woman. He called 911 at 2:13 a.m. and told the men to stop. In the 911 recording, the victim reported seeing a black man wearing black clothing hitting a white woman near 548 East Broadway and enter the house at that location. However, at trial the victim was certain there were two men, one African American and one white, hitting the woman on her head. The victim remembered talking to Detective Anderson, but the victim could not recall saying whether he could or could not identify his attackers.

**{¶ 3}** The victim also remembered going up to an open window of the house, which did not have a screen, because he heard the woman screaming inside the house.

2.

He pulled the curtain aside and told them through the window to stop beating her and that he had already called the police. He did not see anyone in the room at the time. After he told the residents he had called the police, they were quiet. He could not remember having a conversation with the people.

{¶ 4} Another 911 caller reported at 2:17 a.m. that two men were severely beating a man at East Broadway and Nevada Streets next to the Family Dollar. She saw one man punching and kicking another man who was on the ground. It was dark, so she could not describe anyone or determine if they had any weapons.

{¶ 5} The next thing the victim remembered was waking up in the hospital days later. He had suffered a traumatic brain injury and respiratory failure. He spent weeks in the hospital and rehabilitation and had not yet fully recovered at the time of trial. He had not returned to work and could no longer drive because of his injuries.

{¶ 6} An officer who responded to the first 911 call found the victim around 2:20 a.m. at the Family Dollar Store on East Broadway, approximately 50 yards from the defendant's home. The victim was able to stand when they arrived. He was breathing very heavily, was flush in the face, his eyes were watering, and he had fresh blood around his nose and mouth area. He seemed very frightened and eager to leave the area. He refused medical treatment. He told the officer two guys jumped on him and beat him up. He said he had observed them assaulting a female. After the victim had intervened, the men told the victim he had made a mistake and should never have gotten involved before

3.

they attacked him. The victim indicated that he did not want an assault report taken, but the officer entered a report.

{¶ 7} The victim's roommate assumed the victim would arrive home 20 minutes after they left the bar. Not long after that time, a police officer arrived with the victim and the roommate helped to get the victim into the house. The victim was unable to walk up the steps into the home and one of his legs could hardly move at all. Once they got the victim into the house, the roommate let the victim lay down on the floor. The victim stated someone had beaten him and that his head and jaw hurt. The roommate offered to take the victim to the hospital, but the victim wanted to wait until morning. The next morning, around 10:00 a.m., the roommate found the victim in exactly the same spot, "hyperventilating snoring," and unconscious and called 911 at 10:21 a.m.

{¶ 8} Miranda Rutkowski, a cousin of April Robedeau, testified Robedeau had been renting the house at 548 East Broadway Street where appellant lived with his girlfriend, Courtney Bourne, and their children. Rutkowski knew appellant and that his street nickname is "Hammer." Rutkowski also testified she was with Robedeau at the same bar as the victim that night. Robedeau and Rutkowski returned home and then drove appellant back to pick up Bourne, but she was not ready to leave. Robedeau dropped off appellant and drove Rutkowski home. The next day Rutkowski returned to Robedeau's house. Appellant told her he had beaten someone up the night before after she had gone home. He told her the victim had been at the window and that he and

4.

Bourne had been fighting over a former girlfriend. Appellant seemed upset because he had just hit the victim and Tyron Murphy had beat the man.

{¶ 9} Detective Anderson of the Toledo Police Department became involved on April 5, 2015, because the injuries the victim suffered were possibly life-threatening and were allegedly caused by an assault. He went to 548 East Broadway to contact the female the victim had tried to help the night before. A black male, Trey Houston, answered the door and denied knowing anything about what had occurred. He mentioned, however, that "Hammer" had knocked somebody out the night before. The detective learned that appellant is called "Hammer" and he was awakened to speak briefly to the detective. Appellant was wearing all black clothing at the time. The detective drove both men to the station to interview them further. The interviews were recorded and played for the jury.

{¶ 10} During the interview, appellant stated he had walked home alone with Bourne from the bar. She was very drunk and arguing about appellant cheating on her. They saw no one as they walked home, but were stopped by an officer who checked to see what was happening. After they went into the house, appellant was trying to get Bourne to quiet down and go to sleep when the victim put his head in the bedroom window and said he had called the police. Appellant called the victim names and told him to get off the property. The victim appeared drunk to appellant because he was slurring his words. The victim told appellant, "If you don't like it, do something about

5.

it." Appellant was angry and went outside, but the victim had walked down the street to the Family Dollar Store and was yelling to people at a bar across the street.

{¶ 11} During the interview, appellant's story changed several times as to what happened next. First, he stated he saw some guys confront the victim, but did not know what happened because he went back to his house. Second, appellant stated he followed the victim to the Family Dollar and got in his face. After the victim pushed appellant, he hit the victim once in the jaw and the victim fell against the wall, slid down, and stayed down as appellant told the victim to stay away from appellant's house. Appellant also added that the victim had been at the house bothering them before and started trouble, but he did not know his name. As he went back to the house, appellant saw the victim yelling and walking near the bar. Appellant saw several neighborhood black men were in the area.

{¶ 12} After the interview, the detective checked a video camera across the street from the house. The video was played for the jury. The video was not clear enough to make out faces of the individuals. However, it showed two people arriving home around 2:12 a.m. after traveling in the direction from the bar toward their home. One person was wearing dark-colored clothing and the other person was wearing light-colored clothing. At 2:13 a.m., a light could be seen near a person's head, which appeared to be someone making a telephone call. Later, around the side of the house, the same person is seen opening the curtain and looking into the window. Shortly afterward, four persons were seen coming out of the house at 2:16 a.m. One person was wearing dark-colored

6.

clothing. One person pointed and three people moved down the street out of the range of the video, in the direction of the Family Dollar Store. The three people returned to the house a few minutes later.

{¶ 13} After viewing the footage, the detective interviewed appellant again the next day, which was played for the jury. During the second interview appellant stated "Wolfie," Tyron Murphy, walked down the street behind appellant. Another man, Cameron Wells, followed them down the street part of the way and then returned to the house. Appellant denied kicking the victim, but stated that "Wolfie" had kicked the victim once or twice. Appellant added that he hit the victim two times until the victim raised his hands. Furthermore, appellant stated that while he was getting off of the victim, "Wolfie" kicked the victim twice. As they walked away, the victim was getting up and yelling about calling the police. Appellant denied hitting the victim hard and did not think "Wolfie" had kicked the victim hard enough to hurt him.

{¶ 14} The detective interviewed the victim while he was at the hospital. He could not remember the assault but he could remember everything up until that time. He stated he did not know the individual who attacked him.

{¶ 15} Bourne testified for the defense that she had been at the bar that night and was very drunk when she and appellant returned home after walking along East Broadway and that they were arguing. She did not recall a police officer stopping them. She denied appellant ever struck her. They continued to argue inside their home, but they stopped soon afterward because she fell asleep. She did not recall anyone interfering

7.

with their argument or sticking their head in the bedroom window. After appellant's first interview with the detective, she asked appellant if he knew anything about the assault and he denied knowing what happened. They never discussed the matter after that time.

{¶ 16} Appellant testified on his own behalf. He testified he walked Bourne home because she was drunk and she argued with him. They passed by a police officer who stopped them twice because they were so loud and he could see Bourne was drunk. After they arrived home, appellant was trying to get Bourne to go to bed when the victim stuck his head in the window saying he had called the police. Appellant was startled and told the victim to get away from the house. Appellant shut the window and went outside with his friends (Murphy, Wells, and Houston) following. The victim was stumbling his words as he cursed appellant. Appellant told the victim to leave and not come back. Appellant went back in the house. He testified he only made the statements he did to the detective because appellant was trying to protect Murphy. During the altercation, Murphy passed by appellant and followed the victim down the street toward the Family Dollar Store. Appellant tried to stop Murphy because he knew what Murphy could do to the victim. When he could not stop Murphy, appellant returned to the house and never saw what happened to the victim. Appellant denied ever striking the victim.

{¶ 17} In his first assignment of error, appellant argues that he received ineffective assistance of counsel at multiple points during his trial.

{¶ 18} Appellant bears the burden of proving that his counsel was ineffective since an attorney is presumed competent. *Strickland v. Washington*, 466 U.S. 668, 689, 104

8.

S.Ct. 2052, 80 L.Ed.2d 674 (1984) and *State v. Lott*, 51 Ohio St.3d 160, 174, 555 N.E.2d 293 (1990). To meet this burden of proof, appellant must show that: (1) there was a substantial violation of the attorney's duty to his client, and (2) the defense was prejudiced by the attorney's actions or breach of duty. *Strickland, supra*, at 687, and *State v. Smith*, 17 Ohio St.3d 98, 100, 477 N.E.2d 1128 (1985). Prejudice is shown where there is a reasonable probability that a different result would have occurred in the case if the attorney had not erred. *State v. Noling*, 98 Ohio St.3d 44, 2002-Ohio-7044, 781 N.E.2d 88, ¶ 108, quoting *State v. Bradley*, 42 Ohio St.3d 136, 538 N.E.2d 373 (1989), paragraph three of the syllabus.

{¶ 19} The failure to object to evidence is not per se ineffective assistance. *State v. Conway*, 109 Ohio St.3d 412, 2006-Ohio-2815, 848 N.E.2d 810, ¶ 103. The decision to object is generally seen as party of trial strategy. *State v. Hartman*, 93 Ohio St.3d 274, 296, 754 N.Ed.2d 1150 (2001). Likewise, the decision of whether to file and when to file a motion in limine is a strategic decision, *State v. Swiergosz*, 197 Ohio App.3d 40, 2012-Ohio-830, 965 N.E.2d 1070, ¶ 22 (6th Dist.), as is the decision to request a curative jury instruction. *Conway* at ¶ 111. Even the decision to move for a mistrial is a tactical decision and should only be sought when substantial rights are adversely affected and there is no possibility of a fair trial. *State v. Seiber*, 56 Ohio St.3d 4, 12, 564 N.E.2d 408 (1990). We must consider whether there was a legitimate basis for the objection, whether the reason for not entering an objection was a trial tactic, and finally whether it prejudiced the defendant.

9.

{¶ 20} First, appellant argues appellee introduced inadmissible hearsay into evidence through Detective Anderson and while cross-examining appellant which was very prejudicial to him. Appellant argues that his counsel should have anticipated this statement because the detective made the same statement at a motion to suppress hearing.

Detective Anderson testified that he spoke to a man who opened the door, Hudson, who mentioned that "Hammer [appellant] had knocked somebody out last night." As a result of this statement, the detective interviewed both Hudson and appellant.

{¶ 21} Hearsay is defined as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Evid.R. 801(C). Therefore, an out-of-court statement introduced for purposes of explaining the subsequent investigative activities of a police officer to whom the statement was made is not hearsay. *State v. Thomas*, 61 Ohio St.2d 223, 232, 400 N.E.2d 401 (1980). In the case before us, we find the statement made by Houston was not hearsay.

{¶ 22} Second, appellant argues that during cross-examination of appellant, the prosecuting attorney asked him: "Do you remember telling Cameron Wells that you stopped hitting the guy because you felt a soft spot on his head?" Wells did not testify at trial.

{¶ 23} Since the trial court agreed that this hypothetical question included a hearsay statement and sustained appellant's objection, the only issue remaining is whether counsel should have sought additional corrective measures such as a jury

10.

instruction or moved for a mistrial. We find that it was reasonable for trial counsel to accept the court's action of striking the question and to not seek a jury instruction to prevent further attention from being drawn to the statement.

{¶ 24} Appellant argues his counsel should have moved for a mistrial arguing the question materially prejudiced his case because the question negatively impacted his credibility. We disagree. The inconsistency of appellant's testimony had already negatively impacted his credibility. This was not a case where the factual issues turned on the credibility of appellant's testimony. *State v. Nichols*, 116 Ohio App.3d 759, 765, 689 N.E.2d 98 (10th Dist.1996). We do not find that the outcome of the trial would have been different if the statement had been excluded. Appellant admitted during his interviews to striking the victim. The timing of the 911 calls and the surveillance video places appellant at the scene at the time the victim was attacked. Appellant's first assignment of error is not well-taken.

{¶ 25} In his second assignment of error, appellant argues that his conviction was contrary to the manifest weight of the evidence.

{¶ 26} A challenge to the weight of the evidence questions whether or not the greater amount of credible evidence was admitted to support the conviction. *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, 972 N.E.2d 517, ¶ 17-19; *State v. Thompkins*, 78 Ohio St.3d 380, 386-390, 678 N.E.2d 541 (1997). When weighing the evidence, the court of appeals must consider whether the evidence in a case is conflicting or where reasonable minds might differ as to the inferences to be drawn from it, consider

11.

the weight of the evidence, and consider the credibility of the witnesses to determine if "the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *Id.* at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983). "[I]n determining whether the judgment below is manifestly against the weight of the evidence, every reasonable intendment and every reasonable presumption must be made in favor of the judgment and the finding of facts." *Eastley* at ¶ 21, quoting *Seasons Coal Co., Inc. v. Cleveland*, 10 Ohio St.3d 77, 80, fn. 3, 461 N.E.2d 1273 (1984) (citation omitted).

{¶ 27} Pursuant to R.C. 2903.11(A)(1), appellee was required to prove beyond a reasonable doubt that appellant "knowingly * * * [c]ause[d] serious physical harm to another."

{¶ 28} Appellant argues that there was no physical evidence that appellant was involved in the altercation other than inadmissible hearsay. Therefore, he argues that his conviction was contrary to the manifest weight of the evidence.

{¶ 29} Upon a review of all of the evidence presented in this case, we find that the jury did not lose its way in evaluating the evidence and drawing inferences from the direct evidence. The witness testimony, the timing of the events, the surveillance recording, the 911 calls, and appellant's statements to the police and his testimony at trial all point to appellant as the perpetrator. Therefore, we find that appellant's conviction was not contrary to the manifest weight of the evidence. Appellant's second assignment of error is not well-taken.

12.

{¶ 30} Having found the trial court did not commit error prejudicial to appellant and that substantial justice has been done, the judgment of the Lucas County Court of Common Pleas is affirmed. Appellant is ordered to pay the costs of this appeal pursuant to App.R. 24.

                                                          Judgment affirmed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Arlene Singer, J.                        _____
                                                          JUDGE
Thomas J. Osowik, J.

James D. Jensen, P.J.               _____
CONCUR.                                            JUDGE

                                                 _____
                                                          JUDGE