[Cite as *State v. Manuel*, 2025-Ohio-1582.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
LUCAS COUNTY

State of Ohio                                                    Court of Appeals No.  L-24-1143

     Appellee                                                Trial Court No.  CR0202302067

v.

Daquan Manuel                                          **DECISION AND JUDGMENT**

     Appellant                                               Decided:  May 2, 2025

* * * * *

Julia R. Bates, Lucas County Prosecuting Attorney, and
Lorrie J. Rendle, Assistant Prosecuting Attorney, for appellee.

Michael H. Stahl, for appellant.

* * * * *

**SULEK, P.J.**

{¶ 1} Appellant, Daquan Manuel, appeals the Lucas County Court of Common Pleas' May 17, 2024 judgment sentencing him to 17 months of imprisonment following his strangulation conviction.  For the reasons that follow, the trial court's judgment is affirmed.

## I. Facts and Procedural History

{¶ 2} On July 6, 2023, Toledo Police effectuated a stop after hearing screams for help coming from a moving vehicle. Victim, C.C., stated that her husband, Manuel, choked and strangled her. The incident resulted in the Lucas County Grand Jury's return of an indictment charging Manuel with strangulation, in violation of R.C. 2903.18(B)(3) and (C), a fourth-degree felony. He pleaded not guilty.

{¶ 3} During the April 16, 2024 bench trial, C.C. testified that she and Manuel married in 2020 and have four children together. In July 2023, they lived together in his grandmother's basement. On the morning of July 6, 2023, C.C. and Manuel got ready and left for work together, sharing one vehicle. C.C. dropped Manuel off at work, got him breakfast and delivered it to him. C.C. testified that Manuel seemed angry or that he was having a "mood swing."

{¶ 4} C.C. began her workday as a TARTA bus driver around 9:00 a.m. At noon C.C. took her lunch. She coordinated lunch breaks with Manuel to give him the car, he then dropped her back off at work. After lunch, Manuel began sending C.C. insulting text messages and calling her phone. C.C. could not answer her phone because she was in driver's training so Manuel called the TARTA office. Dispatch radioed her to call in; they then told her to call her husband.

{¶ 5} C.C. testified that when she called Manuel, he accused her of not working and threatened to come to her work and "beat [her] ass." His threatening texts continued until he picked her up at 10:45 p.m. Manuel again accused her of not working and ignoring his texts, he stated: "I ought to slap your ass right now." C.C. testified that she

2.

called 911 which went to voicemail. Manuel then took the phone out of her hand, pulled the car over, and began strangling her.

{¶ 6} C.C. stated that when Manuel had his hands around her neck strangling her, she "dazed out. I blacked out." After Manuel released her, C.C. started making noise to get attention. She honked the horn, rolled down the window, and began yelling for help. C.C. testified that during this time, Manuel was "flying" down Eleanor Avenue towards Willys Parkway in Toledo, Lucas County, Ohio. C.C. grabbed the steering wheel trying to pull the car over. Police eventually stopped the vehicle and C.C. told them what happened. EMS advised her to go to the hospital; she refused because she had to ensure her children's safety. She retrieved the children from Manuel's grandmother's house and took them to her mother's house in Flint, Michigan.

{¶ 7} C.C. stated that she had bloodshot eyes, a scratch on her face, and Manuel's hands imprinted on her neck. Her throat hurt the next day and she had some difficulty speaking.

{¶ 8} During cross-examination, C.C. described the incident as follows:

A: He took his hands and put them around my neck.
. . .
A: I was sitting in the passenger seat and he reached over and choked me and pulled me back this way (indicating).
. . .
Q: Okay. And, approximately, how long, if you can recall, did he have his hands around your neck for?
A: Until the point where I blacked out.
Q: Time-wise are we talking a few seconds?
A: No, it wasn't a few seconds. I was tying to have him remove his hands. I would say it was three or four minutes.

3.

**{¶ 9}** Toledo Fire Department EMS technician Jordan King responded to an assault call and treated C.C. at the scene. He testified that C.C. had "minor lacerations on her face, bruising on her neck, and minor lacerations on her hands as well." C.C. told him that she had been hit and choked while in the car.

**{¶ 10}** During cross-examination, King acknowledged that C.C.'s respiration, or breath rate and flow, were normal. King admitted that he had never treated a strangulation victim and lacked the training and experience necessary to demine the cause of the injury on C.C.'s neck.

**{¶ 11}** Toledo Police Sergeant Robert Scott testified that on July 6, 2023, he was investigating a pizza store robbery on Eleanor Avenue in Toledo, Ohio. While parked and documenting information from the robbery, Sergent Scott observed a light-colored vehicle drive by and thought he heard screams for help. A nearby bar patron walked up to the patrol vehicle and said he heard a woman screaming for help in the vehicle. He followed the vehicle and effectuated a traffic stop.

**{¶ 12}** Once the occupants exited the vehicle, the female passenger approached and stated that she had been "choked or strangled." Sergeant Scott testified that he worked to separate the parties to gain control over the situation. Scott had a body worn camera ("BWC") on and recording during the incident. The State played the ten-minute video without objection.

**{¶ 13}** Sergeant Smith testified that C.C. had blood and scratches under her eyes. He observed some bruising around her neck but stated that he "didn't see the severity of it until later on until when the pictures were taken." Smith stated that "it looked like

4.

something had been placed around her neck and squeezed." C.C. "believed that she had passed out and didn't know if she lost any consciousness or not during the incident." She was visibly upset and emotional.

{¶ 14} Defense counsel cross-examined Smith regarding the severity of C.C.'s injuries. Smith initially noticed the bruising on the right side of her neck; he stated that the photo, State's Exhibit No. 6, also showed scratches around her neck. Using the photo, Sergeant Smith pointed to the area of bruising he saw the night of the incident.

{¶ 15} Smith acknowledged that in addition to personally observing the incident, police received a 911 call from a witness who heard a woman screaming from her car. The parties previously stipulated to the admission of the 911 recording.

{¶ 16} Toledo Patrol Officer Jacob Bombrys and his partner responded to the scene of a possible assault. Bombrys stated that C.C. was extremely upset and had what looked like cuts under each eye, marking and bruising on her neck, and cuts on her hands. Bombrys photographed her injuries and identified the photographs; the court admitted them into evidence without objection. The State played Bombrys' BWC footage for the court.

{¶ 17} On cross-examination, reviewing State's exhibit No. 6, Bombrys clarified that the bruising on C.C.'s neck was in "roughly the middle underneath the chin area." Bombrys could not identify the wetness on C.C.'s neck. Defense counsel then replayed and paused a portion of Bombrys' BWC footage; counsel had Bombrys step closer to the screen to better observe something coming down her neck. He agreed that the substance had a "brownish or reddish" tint and that the scratches under her eyes were bloody.

5.

Bombrys also agreed that during the BWC footage, C.C. never stated that Manuel choked her to the point of blacking out.

{¶ 18} During redirect examination, Bombrys clarified his belief that the mark on C.C.'s neck was a bruise because it was "actually within the layers of the skin" and it was not something that could be wiped off.

{¶ 19} At the close of the evidence, Manuel's counsel moved for acquittal pursuant to Crim.R. 29. Counsel claimed that the State failed to present prima facie evidence that Manuel choked C.C. "to the point where she could not breathe, where she blacked out, saw stars, or almost went unconscious." The State countered that C.C. testified that she blacked out and that when he stopped choking her, she gasped because she lost her breath. The State also pointed to the photographic evidence of the bruising on her neck. The trial court denied the motion.

{¶ 20} On April 18, 2024, after reviewing the exhibits and notes taken during trial, the trial court found Manuel guilty of strangulation. This appeal followed sentencing.

## II. Assignments of Error

{¶ 21} Manuel raises two assignments of error:

> Assignment of Error I: The conviction was not supported by sufficient evidence and contrary to the manifest weight of the evidence.

> Assignment of Error II: Trial counsel failed to provide effective assistance of counsel.

## III. Analysis

### A. Sufficiency and Manifest Weight of the Evidence

**{¶ 22}** Manuel's first assignment of error is that his strangulation conviction is supported by insufficient evidence and is against the weight of the evidence. "Insufficiency and manifest weight are distinct legal theories." *State v. Fenderson*, 2022-Ohio-1973, ¶ 73 (6th Dist.). "In reviewing a record for sufficiency, '[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.'" *Id.*, quoting *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus.

**{¶ 23}** In contrast, when reviewing a manifest weight claim,

> "[t]he court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction."

*Id.*, quoting *State v. Lang*, 2011-Ohio-4215, ¶ 220, quoting *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997).

**{¶ 24}** Manuel was convicted of strangulation, R.C. 2903.18(B)(3), which prohibits a person from knowingly causing or creating "a substantial risk of physical harm to another by means of strangulation or suffocation."

7.

**{¶ 25}** Under R.C. 2901.22(B):

> A person acts knowingly, regardless of purpose, when the person is aware that the person's conduct will probably cause a certain result or will probably be of a certain nature. A person has knowledge of circumstances when the person is aware that such circumstances probably exist. When knowledge of the existence of a particular fact is an element of an offense, such knowledge is established if a person subjectively believes that there is a high probability of its existence and fails to make inquiry or acts with a conscious purpose to avoid learning the fact.

"'Substantial risk' means a strong possibility, as contrasted with a remote or significant possibility, that a certain result may occur or that certain circumstances may exist," R.C. 2901.01(A)(8), and "'[p]hysical harm to persons' means "any injury, illness, or other physiological impairment, regardless of its gravity or duration." R.C. 2901.01(3). R.C. 2903.18(A)(1) defines strangulation as "any act that impedes the normal breathing or circulation of the blood by applying pressure to the throat or neck, or by covering the nose and mouth."

**{¶ 26}** Manuel claims that the State failed to present any evidence that Manuel knowingly restricted C.C.'s breathing and that the statute requires more than a neck injury. The court disagrees. On both Sergeant Scott's and Officer Bombrys' BWC footage, C.C. repeatedly states that Manuel "choked her out" and that he strangled her. At trial, C.C. testified Manuel had his hands around her neck and that she "dazed out" or "blacked out" while being choked. C.C. stated that it took three to four minutes and her blacking out and then gasping for air for him to remove his hands from around her neck. C.C. testified that her neck and throat hurt the following day. The BWC footage and

8.

photographs admitted at trial show bruising on C.C.'s neck. Taken together, this evidence was sufficient to support Manuel's strangulation conviction.

{¶ 27} Manuel next contends that his conviction is against the weight of the evidence because the BWC footage clearly shows tears running down C.C.'s face which could have been the source of the marks on her neck. Manuel further questioned C.C.'s credibility because her trial testimony included claims that she "dazed" or "blacked out" which she did not tell police on the night of the incident.

{¶ 28} Reviewing the exhibits and testimony presented at trial, we cannot say that the trial court lost its way or created a manifest miscarriage of justice in believing the testimony presented at trial to be credible and finding Manuel guilty of strangulation.

{¶ 29} Based on the foregoing, Manuel's strangulation conviction is supported by sufficient evidence and is not against the weight of the evidence and his first assignment of error is not well-taken.

## B. Ineffective Assistance of Counsel

{¶ 30} Manuel's second assignment of error is that his trial counsel ineffectively failed to object to the admission of Officer Bombrys' "unduly prejudicial statements" from his BWC footage. Though he admits that the video portion of the footage supports his theory that a mixture of blood and tears caused the marks on C.C.'s neck, Manuel claims that Bombrys' reference to the bruise on the underside of C.C.'s neck was hearsay and overly prejudicial. The state contends that the video was admissible to show the course of the investigation.

9.

**{¶ 31}** In considering Manuel's claim of ineffective assistance of counsel, the court employs a two-step process:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

*Strickland v. Washington*, 466 U.S. 668, 687 (1984); *State v. Bradley*, 42 Ohio St.3d 136 (1989), paragraph two of the syllabus. To establish prejudice, "the defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Bradley* at 142.

**{¶ 32}** Evid.R. 801(C) defines hearsay as an out of court statement "offered in evidence to prove the truth of the matter asserted in the statement." Statements offered to explain the course of a criminal investigation are not considered hearsay where they are not offered for their truth. *State v. Farris*, 2022-Ohio-3584, ¶ 26 (6th Dist.); *State v. Winters*, 2013-Ohio-2370, ¶ 61 (6th Dist.).

**{¶ 33}** Here, the disputed BWC footage shows Officer Bombrys photographing C.C.'s injuries; he asks her to lift her neck so he can photograph the bruise. Thus, the video shows how C.C.'s injuries were documented and provides context for the photographs admitted into evidence. Thus, the statement was not hearsay.

**{¶ 34}** Even if the statement is considered inadmissible hearsay, Sergeant Scott, Officer Bombrys, and C.C. testified regarding the bruising around C.C.'s neck and the court admitted into evidence State's exhibit No. 6, which depicts the bruising. Thus, the

10.

statement in the video is cumulative to other admissible evidence and any error is harmless. *State v. Wears*, 2023-Ohio-4363, ¶ 62, (3d Dist.); *State v. Pouge*, 2024-Ohio-4578, ¶ 94 (8th Dist.). Accordingly, Manuel did not receive ineffective assistance of trial counsel and his second assignment of error is not well-taken.

## IV. Conclusion

{¶ 35} Based on the foregoing, the judgment of the Lucas County Court of Common Pleas is affirmed. Pursuant to App.R. 24, Manuel is ordered to pay the costs of this appeal.

Judgment affirmed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Thomas J. Osowik, J.

_____
JUDGE

Myron C. Duhart, J.

Charles E. Sulek, P.J.
CONCUR.

_____
JUDGE

_____
JUDGE

This decision is subject to further editing by the Supreme Court of Ohio's Reporter of Decisions. Parties interested in viewing the final reported version are advised to visit the Ohio Supreme Court's web site at: http://www.supremecourt.ohio.gov/ROD/docs/.