[Cite as *State v. Walker*, 2025-Ohio-5607.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
LUCAS COUNTY

| | |
|---|---|
| State of Ohio | Court of Appeals No.L-24-1159 |
| Appellee | |
| | Trial Court No. CR0202301006 |
| v. | |
| Charles Walker | **DECISION AND JUDGMENT** |
| Appellant | Decided:  December 16, 2025 |

* * * * *

Julia R. Bates, Prosecuting Attorney and
Evy M. Jarrett, Assistant Prosecuting Attorney, for appellee.

Michael H. Stahl, and
Michael Aird, for appellant

* * * * *

**SULEK, P.J.**

{¶ 1} Appellant, Charles Walker, appeals the June 4, 2024 judgment of the Lucas County Court of Appeals which, following a jury trial, sentenced him to an aggregate term of life imprisonment for his convictions for aggravated murder, murder, and kidnapping.  For the foregoing reasons, the judgment is affirmed.

## I. Facts and Procedural Background

### A. The Indictment

{¶ 2} On January 4, 2023, the Lucas County Grand Jury indicted Walker on two counts each of aggravated murder, R.C. 2903.01(B) and (G), murder, R.C. 2903.02(B) and 2929.02, and kidnapping, R.C. 2905.01(A)(3) and (C) in connection with the deaths of two minor boys, K.W. and K.P.  Walker pleaded not guilty.

### B. The Trial

### 1. The Party, the Ride, and the Missing Boys

{¶ 3} Several individuals were indicted in connection with the murders. Codefendants Walker and Brent Kohlhofer were tried jointly before a jury commencing on May 2, 2024.  The parties presented the following evidence.

{¶ 4} Birthday party host P.L. testified that on December 3, 2022, K.P. and K.W. attended a birthday party at Maumee Bay State Park that P.L. was hosting for her child. P.L. asked K.P. and K.W. to leave the party after learning that one of them had a gun. She escorted them to the front desk where they waited for an Uber to pick them up.  She did not know them before the party.

{¶ 5} The Uber driver arrived at 8:14 p.m. and drove K.P. and K.W. to a residence on Maumee Street in South Toledo; the ride took approximately 15 minutes.  A third party giving the name John ordered the Uber at 7:46 p.m.; the driver stated that the name did not match the account.

{¶ 6} A parent of each boy testified regarding attempts to contact them over the weekend.  K.P.'s mother, K.R., stated that she last saw him on her security camera the

2.

morning of December 2, 2022, and last spoke to him early on Saturday, December 3. K.P. called her on Saturday night to ask for a ride, but she missed the call. He did not answer when she tried to call him back. K.R.'s concern grew over the weekend when she could not contact him. On Monday, December 5, she posted on Facebook asking if anyone had seen him and ultimately reported to the police that he was missing.

{¶ 7} A month or two before K.P.'s murder, K.P. called K.R. to tell her that they needed to move out of their house. Kohlhofer had threatened to burn down their house because Kohlhofer "was blaming [K.P.] for breaking into his house." K.R. did not report this threat to the police. After K.P.'s death, K.R.'s house burned down. She was unsure of the cause.

{¶ 8} On cross-examination, K.R. said that K.P. and Kohlhofer had a good relationship and that Kohlhofer fed K.P., took him on trips and outings, and hired him to do odd jobs.

{¶ 9} C.W., K.W.'s father, testified that he last saw K.W. alive on December 3, 2022. K.W. and K.P. were going to a slumber party at Maumee Bay that night. By December 4 or 5, C.W. became concerned about K.W. because no one had spoken to him, and he usually spoke to his siblings daily. C.W. called 911 to report K.W. missing on December 5.

{¶ 10} K.W.'s cousin last texted and spoke with him at 9:00 p.m. on December 3. He said he was at "[A.E.]'s people's house" with K.P., meaning his girlfriend's relatives on Maumee Avenue. The cousin told K.W. to leave the house because he feared for his safety because he had stolen codefendant Gingrich's gun. K.W. said he would leave after

3.

he finished what he was doing. The cousin got no answer when he tried calling him back.

{¶ 11} Gingrich's niece, A.E., testified that she previously dated K.W.; they were not together but were talking when he died. K.W. lived at her house part of the time and at his dad's house. She learned he was missing on December 5. A.E. stated that she last saw K.W. on November 29, 2022; they were arguing and her mom dropped him off at Gingrich's house where he did odd jobs. Gingrich lived with his girlfriend, Carrissa, and his two children. She last spoke with him on December 2.

{¶ 12} On December 5, A.E. learned from K.W.'s sister that K.W. was missing. The sister sent her screenshots of messages between A.E.'s cousin, B.W., and K.W. arranging an Uber, and tracking its progress, to take the boys to Gingrich's house. The images were admitted into evidence.

{¶ 13} A.E. confronted B.W. regarding the messages because he and Gingrich denied seeing the boys. She felt they were lying to her and never spoke to them again. A.E. gave police the information.

{¶ 14} Lieutenant Philip Cook of the Toledo Police Department (TPD) testified that he is responsible for retrieving 911 calls and call records. He presented the records of C.W.'s December 5, 2022 911 call to report K.W. missing. In the call, C.W. provided K.W.'s demographic information, told the operator what K.W. was wearing when he was last seen, and said that K.W. was last seen on December 3 around 4:00 p.m.

{¶ 15} TPD Officer Antonio Aguilar conducted a safety check at 507 Maumee following reports that the boys were last seen at that address.

4.

## 2. The December 5, 2022 Fire and December 15 Excavation

{¶ 16} Lieutenant Cook also presented the records of the six 911 calls that came in about the fire at a vacant house located at 3015 Chase Street. The callers reported that someone threw an unknown object that made a loud sound into the back of the house, there was thick black smoke, and the back of the house was engulfed in flames.

{¶ 17} TPD Officer Cole Decant responded to the fire at 3015 Chase Street just after midnight on December 5, 2022. When he arrived, he saw flames and smoke coming from the house. He interviewed neighbors who told him that they saw a person throw something that was on fire into the house and then run away down the alley. The neighbors were not able to give any more information about the person.

{¶ 18} Later that day, Decant was working as a desk officer at the safety building when K.R. came in to report K.P. missing. He had been gone for approximately two days. Decant took her report and notified the investigative services bureau and the records department.

{¶ 19} During cross-examination, Decant said that the neighbors could not say which direction the person in the alley went. Decant believed that he asked the neighbors about the person's race and gender, despite those questions not appearing in the body camera video.

{¶ 20} Robert Krause, a battalion chief with the Toledo Fire Division (TFD), also responded to the fire at 3015 Chase Street. When he arrived, he assessed the house and determined that the fire was concentrated in the back left corner of the building. As firefighters were putting out the fire, one of them fell through the stairs. The fire made its

5.

way into the walls and the attic, and the crews had to chase the fire. Krause eventually decided to pull the firefighters out of the building for their safety and have them fight the fire from the outside. Although they were able to put most of the fire out, they could not completely extinguish it without demolishing the house.

{¶ 21} D.M. lived near 3015 Chase. He called 911 on December 5, after seeing a fire burning through a window of the house. He did not see who threw something into the house, who started the fire, where the person went after starting the fire, or the police canvassing the area to see if they could find the person who ran away from the house.

{¶ 22} C.B. lived across the street from 3015 Chase. On December 5, she was checking her security camera before she went to bed when she "heard an explosion, and the house across the street from [her] was engulfed in flames." She called 911 to report the fire. She told the operator that she heard a male voice and a female voice in the back of 3015 Chase, near the alley, but she could not see who was speaking. She did not see anyone throw anything into the house. C.B. described the house as abandoned and poorly maintained, with overgrown grass and no landscaping. She was not looking outside in the hours before the fire, so she did not know if cars came and went before the fire.

{¶ 23} TFD arson investigator, Kathryn Brown, testified about her investigation of the fire at 3015 Chase Street. When she arrived, firefighters were working to extinguish the fire. She could not enter the house because it was unsafe. Brown spoke with several witnesses who reported seeing someone throw a Molotov cocktail into the house, but they

6.

could not identify the person because the person was wearing dark clothes, it was very early in the morning and dark, and the witnesses were not near the person.

{¶ 24} Brown determined the fire was incendiary, meaning it was intentionally set, because the house was abandoned, there were no utilities at the house, and witnesses saw someone throw something that was burning into the house. She also concluded that the fire started in the left rear of the house. Brown returned to the scene the next day to interview witnesses and look for cameras that might have captured footage. She did not find any video cameras.

{¶ 25} Shelbie Flegall, a firefighter paramedic and K-9 handler for the Springfield Township Fire Department, had her K-9 partner, Darwin, a trained cadaver dog, examine the rubble at 3015 Chase Street on December 15, 2022. Darwin alerted to the presence of human remains in an area of the rubble near the back left corner of the house. A second cadaver dog from a different organization independently alerted to the same area.

{¶ 26} FBI special agent, Sara Pederson, was the team leader of the evidence response team that helped search the rubble of the house. Their process involved an excavator scooping debris from the rubble and putting it in the alley that ran beside the house. Team members then sifted through the debris and marked, photographed, and collected any evidence they found. Ultimately, the evidence response team found the boys' naked bodies "basically at the bottom of the pile of debris." They also found and collected a black HDMI cord, another black cord, some tape, and two videogame controllers with attached cords.

7.

{¶ 27} Charles LeRoux, a detective with the TPD crimes against persons bureau, testified that he was asked to assist at 3015 Chase Street while the FBI was sifting through the rubble. While he was there, he knocked on a neighbor's door to ask about security footage. The neighbor gave LeRoux a hard drive with video footage from December 3, 4, and 5, 2022.[1] He did not speak to other neighbors.

{¶ 28} Dr. Jeffrey Hudson, a Lucas County deputy coroner, performed the autopsies on K.W. and K.P. During K.W.'s autopsy, Hudson noted postmortem thermal burns to much of K.W.'s body; hemorrhages in the superficial and deep strap muscles of the neck and cerebral vascular congestion, which indicated strangulation; and blunt force trauma to the head, evidenced by subgaleal hemorrhage under the left frontotemporal scalp, hemorrhage in the right temporalis muscle, bilateral subarachnoid hemorrhage, and mild cerebral edema. The bleeding on K.W.'s brain was not sufficient to cause death on its own. Hudson opined that K.W. was dead before the fire started, based on negative toxicology results for carbon monoxide and cyanide and the absence of soot and thermal injuries in K.W.'s airways. Hudson determined that K.W.'s cause of death was strangulation, and his manner of death was homicidal violence. He explained that strangulation requires exertion of "a large amount of force" on the front of the neck for "a significant period of time"—as long as "several minutes."

---

[1]LeRoux testified that the timestamps on the surveillance video collected from the house on New York Avenue were 9 to 10 minutes ahead of the actual time. For consistency, all times from that video footage included in the decision have been adjusted accordingly.

8.

{¶ 29} During K.P.'s autopsy, Hudson noted postmortem thermal burns to much of K.P.'s body; a broken right ulna and gaping defects in the buttocks, which were postmortem injuries likely caused by the equipment that excavated the body; and blunt force trauma to the head, evidenced by subgaleal hemorrhage under the left frontotemporal and right frontal scalp, two lacerations on the forehead, right facial swelling, and mild cerebral edema. Hudson opined that K.P. was dead before the fire started, based on negative toxicology results for carbon monoxide and cyanide and the absence of soot and thermal injuries in K.P.'s airways.

{¶ 30} Hudson ultimately concluded that K.P.'s cause of death was homicide by unspecified means, and his manner of death was "Homicide – UNDETERMINED VIOLENCE" because the autopsy did not reveal a specific cause of death. Hudson did not find any indication that K.P.'s death was natural, accidental, or suicide.

{¶ 31} On cross-examination, defense counsel asked Hudson to explain the injuries to the boys' heads in laymen's terms. He said that K.W. suffered blunt force trauma to the left forehead and side of the head; bleeding in the right temporalis muscle, which is the area above the ear; and "patchy" bleeding on the surface of the brain. K.P. suffered mild swelling of the brain. Hudson also confirmed that certain ways of killing someone, such as those from a bag over the head, might not leave evidence on the body. In K.W.'s case, he did not see any evidence of ligature strangulation, e.g., strangulation by rope, twine, or duct tape. Hudson acknowledged that blunt force trauma could be caused by objects like the butt of a gun, and that strangulation is often an up-close,

9.

personal act. He reiterated that he could not determine the specific weapon used or the exact circumstances of the boys' deaths.

### 3. The Investigation and Codefendant Testimony

{¶ 32} Prior to the events at issue, at approximately 11:49 p.m., on November 17, 2022, Washington Township Police Officer Thomas Fall responded to a burglary call at a residence on Patriot Drive. The home's alarm triggered and police were notified. Officers observed a broken windowpane and partially open window next to the back door but saw no signs of actual entry and nothing appeared missing. Officers were able to reach the owner, codefendant Brent Kohlhofer.

{¶ 33} P.Y., has autism and was 17 years old in December 2022. He testified that he is Carrissa Eames and Don Eames'[2] younger brother and was charged as a codefendant in the case. The State initially charged P.Y. with murder and kidnapping, but he pleaded guilty to obstruction of justice, which he described as "[n]ot being truthful." He admitted to not being truthful during the investigation but claimed that he was being truthful at trial.

{¶ 34} On December 3, P.Y. was at Carrissa and Gingrich's house on Maumee Avenue for a party. After the party, he was in the basement playing video games with B.W., Gingrich's nephew. He wore a headset, which made it difficult for him to hear what was going on upstairs.

---

[2]To avoid confusion, Carrissa Eames will be referred to as "Carrissa" and Don Eames as "Eames."

{¶ 35} At some point, K.W. and K.P. came to the house. After they arrived, P.Y. and the others smoked marijuana in the basement. Eventually, Gingrich, Gabriel Garcia, and Eames came down to the basement, and Gingrich "[c]onfronted [K.W.] about the gun." After the confrontation started, P.Y. went to stand halfway up the basement stairs. From there, he could hear "some tussling and confrontation about a gun that has been missing." He saw K.P. with a gun, Gingrich with a gun, and Eames tying K.W. and K.P. up with HDMI cables. P.Y. also heard Gingrich call Cruz Garcia to tell him that K.W. and K.P. were there and Gingrich was confronting them about the missing gun.

{¶ 36} Later, Cruz Garcia came to the house. P.Y. stayed on the stairs "[f]or a second" before going upstairs to the dining room. Carrissa was there with him, and he could hear "confronting" happening in the basement. After a while, K.P., K.W., Garcia, Gingrich, Gabriel, and Eames came up the stairs. K.W. had a bag on his head and was bleeding, but P.Y. could not remember if K.P. was bleeding. K.P. was tied up when he came up the stairs, but P.Y. could not remember if K.W. was tied up. As they walked upstairs, Garcia was behind them and took them out the back door and through the gate into the alley. P.Y. could not see anyone in the alley because it was dark, and he was unsure if anyone was out there.

{¶ 37} During cross-examination, P.Y. confirmed that Gingrich believed K.W. had stolen a weapon and used B.W. (his nephew who was around 13 at the time) to lure K.W. and K.P. to the house. When Gingrich got to the basement, he pulled out a gun. K.P. saw the gun and went to pull out his own gun, but Gingrich and Eames got the gun away from K.P. P.Y. testified that things got worse when Garcia arrived. Garcia thought that

11.

K.P. and K.W. had broken into his mother's house and pointed a gun at her, which explained his level of aggression. Although P.Y. was not sure if Gingrich pistol whipped the boys, he knew that Garcia had. While P.Y. was upstairs, he could hear the boys screaming and pleading and Garcia yelling. Eames got scared when he learned that Garcia was coming to the house because he was afraid that Garcia was going to cause him physical harm.

{¶ 38} Gingrich wanted P.Y. to drive to Maumee Bay to pick up the boys, but he refused because he did not want to be involved. Carrissa told P.Y. not to tell anyone what happened at the house, so he "kept [his] mouth shut." Eames also went with P.Y. and Carrissa to P.Y.'s house, and during the drive, Carrissa stopped the car and told Eames to get rid of the gun that the men had taken from K.P. P.Y. recalled telling the police that he was scared of Garcia and the "other guys."

{¶ 39} On redirect, P.Y. clarified that the "other guys" he told the police about were men that he did not know. He also agreed that he had told the police that he saw people in all black in the alley, but their faces were blocked by the gate. P.Y. did not know who killed the boys or where they were killed.

{¶ 40} Duane Isabell, a TPD Digital Forensics Officer, extracted information from the codefendants' cellphones. On one of the phones that Isabell extracted—with the device name "Corey's phone" and determined to be Gingrich's —he noticed that items had been deleted from the phone, including location data and text messages.

{¶ 41} Pursuant to search warrants, TPD Digital Forensics Detective Joseph Fuller performed extractions on two cell phones. On a cell phone identified as Cruz Garcia's, a

12.

text message was sent to a contact name of "Corbin" on December 3, 2022, at 9:48 a.m., stating: "I'm a send bro just tell me where[.]" An image on Garcia's camera roll on his phone, created on December 5, 2022 at 10:16 a.m. said "We don't fw lames bums or theifs u N****s finished ✅[.]" Fuller stated that "fw" means "fuck with."

{¶ 42} Fuller performed an extraction of Walker's girlfriend Rozlyn Lucas' cell phone. On November 18, 2022, she sent a text message, with photos, to her work bosses claiming her home was broken into, and glass was everywhere. There were three separate hotel confirmation e-mails, from hotels in Maumee and Perrysburg, Ohio, spanning the dates December 15-26, 2022. There were also photographs of Walker with a young child at what appeared to be a hotel.

{¶ 43} M.N., Brent Kohlhofer's nephew and close friends of K.P. and K.W., testified that his uncle blamed K.P. for the November 1, 2022 break-ins and theft of marijuana from two of the three residences he owned on Chase Street. Kohlhofer occasionally stayed at 3038 Chase and sold marijuana from that location. Walker resided at 3046 Chase. He threatened that if K.P. did not return the marijuana the next day, he would burn his house down. M.N. told Kohlhofer that K.P. did not burglarize the homes; Kohlhofer did not believe him.

{¶ 44} M.B. similarly testified that Kohlhofer is his uncle and that he was friends with K.P. and K.W. He lived with his grandmother, Kohlhofer's mother, at 3030 Chase, the third home Kohlhofer owned on the street. The day after the Kohlhofer's house on Patriot and one on Chase were allegedly broken into, K.P. called Kohlhofer to tell him that he and M.B. did not have anything to do with the burglaries. He did not know if any

property was taken from the houses. Kohlhofer responded that "he didn't care. If we didn't do it—if we didn't do it he knew we knew the people that had did it." Kohlhofer took M.B.'s clothing and possessions from M.B.'s grandmother's house because he "said that [M.B.] knew who did it so he took that in retaliation."

{¶ 45} TPD Detective William Clark testified that he is assigned to the Crime Scene Investigation ("CSI") Unit and collects and processes evidence. He processed two vehicles during the investigation, a gray Ford F-150 and a black Chevrolet Impala. Regarding the F-150, he swabbed the interior of the truck for DNA evidence. Clark found a shotgun shell and a hospital blanket with a stain on it in the rear seat of the F-150.

{¶ 46} Detective Clark processed Walker's Chevy Impala twice. The first time, he swabbed the interior of the car for DNA evidence. He found a blue cooler bag with a "red/brown stain" on it and a receipt for the purchase of a tarp, staples, and bungee cords in the backseat of the Impala. The receipt was from December 13, 2022. Clark believed that the interior of the Impala had recently been cleaned, he could not tell whether the trunk had recently been cleaned, and the exterior had "recent road salt and dust on it." The second time he processed the Impala, Clark removed the trunk lining and swabbed the interior of the trunk.

{¶ 47} Clark admitted during cross-examination that he did not swab the bed of the F-150 because detective he had been told to focus on the Impala, and the truck had been stored outside and exposed to rain, which would have destroyed anything of evidentiary value.

14.

{¶ 48} Regarding the Impala, Clark removed the fabric covering all of the seats and arm rests but did not do so for the F-150. He admitted that he was primarily focused on the Impala and was very thorough when he processed the trunk. The trunk liner was made of fabric that would absorb fluids. Clark used a chemical to detect blood evidence in the Impala's passenger compartment but did not find any.

{¶ 49} Ohio Bureau of Criminal Investigations (BCI) DNA Analyst Timothy Augsback authored three DNA reports, admitted into evidence, relating to the analysis of several pieces of evidence in the case. The two items with DNA sufficient for comparison were the piece of glass found in Gingrich's basement and the middle of the videogame controller cord. The glass tested presumptively positive for blood, but Walker, K.P., and K.W. were all excluded as contributors of the DNA on the glass. K.W. was found to be the major contributor to the mixture of DNA on the middle (but not the end) of the videogame controller cord, with the remaining DNA on the middle of the cord not being of sufficient quality for comparison. There was no blood identified on the liner from the Impala's truck. Augsback could not tell when or how K.W.'s DNA got on the controller cord, and not finding a person's DNA on an object did not mean that the person never touched the object; they could have touched it without leaving DNA. Augsback confirmed that there was no DNA found in the trunk of the black Impala.

{¶ 50} John Orlando, an FBI agent assigned to the Cellular Analysis Survey Team (CAST), provides "historical cell site analysis" and specializes in "locating a phone or device in real time, or looking back historically and providing a general area in which that device was during a time frame."

15.

{¶ 51} He stated that cell towers are provider-specific and that to prevent dead zones, cell towers typically provide coverage up to and a bit beyond the next tower and that more densely populated areas have more towers while in rural areas the towers are more spread out. Each triangular tower is divided into three sectors, or sides, with antennas on each side. An individual's cell phone is continuously communicating with the towers to use the best signal available. The best signal is generally, but not always, the geographically closest. This can be impacted by certain factors such as tall buildings or hills.

{¶ 52} Agent Orlando explained that cell phone companies record the activity of each customer including the phone's interaction with the network; specifically, the cell tower and sector or side used, whether the call was incoming or outgoing, the duration of the call, and the cell numbers involve. These call detail records (CDRs) only provide data when the phone is in use.

{¶ 53} In this case, law enforcement contacted Orlando to have him conduct an analysis as to six cell numbers (one phone was associated with two numbers), associated with four of the defendants: a number ending in 5488 that was associated with Garcia, a number ending in 3126 that was associated with Carrissa, numbers ending in 9229 and 4908 that were associated with Walker, and numbers ending in 9020 and 8775 that were associated with Kohlhofer. He reviewed records for December 3 and 4, 2022.

{¶ 54} The CDRs from Garcia's phone showed that he used a cell tower in Michigan from 9:04 to 9:33 p.m. on December 3. After that, from 9:39 to 9:44 p.m., his phone used a tower just across the Ohio line, first using the west sector, then using the

16.

south sector. Beginning at 9:47 p.m., Garcia's phone used a tower in Oregon, near Seaman Road, where he lived. According to Orlando, this showed that Garcia's "phone is moving" because the phone "started up using a tower in Michigan. It used two different sides of a tower after that in Ohio that would be indicative of the device moving in a southern nature, and then ultimately that phone used a tower down . . ." in Oregon. The CDRs also showed that the phone numbers associated with Garcia, Kohlhofer, and Walker were all communicating with each other, Kohlhofer's phones were using a tower near 3015 Chase Street, and all three people's phones were using separate towers. From 10:08 to 10:13 p.m., Garcia's phone used a tower closer to 507 Maumee Avenue, first using the north sector, then using the south sector. From 10:15 to 10:33 p.m., Garcia's phone used the tower nearest to 507 Maumee, which was an omnidirectional tower that did not have sectors. This showed "in totality movement of [Garcia's] phone, moving closer to the 507 Maumee Avenue . . . ." After 10:30 p.m., Walker's 4908 phone moved away from the tower near 3015 Chase, which Orlando said was "indicative of that phone moving in the same general direction as [Garcia's] phone towards the general area of that 507 Maumee Avenue." The CDRs also showed that the phone numbers associated with Garcia, Kohlhofer, and Walker continued to communicate with each other, and Kohlhofer's 9020 phone continued to use the tower near 3015 Chase Street.

{¶ 55} From 10:40 to 10:51 p.m., Garcia's phone continued to use the omnidirectional tower near 507 Maumee. Walker's phones used two sectors on a different tower near 507 Maumee. They first used the southern sector, which faced 507 Maumee, and then used the northwestern sector. From 10:55 to 10:56 p.m., while

17.

communicating with each other, Garcia's phone and Kohlhofer's 8775 phone used two of the same towers and three of the same sectors. The towers were not near either 507 Maumee Avenue or 3015 Chase Street. Orlando said that the phones' movement showed "[Garcia's] phone started towards . . . the general area of 507 Maumee Avenue, and then it ultimately moved and was using the same towers and the same sides of the towers as [Garcia's] phone while it was moving." To him, that was "indicative of the devices moving in the same general direction during that timeframe." He also noted that there were "connections particularly between" Garcia's phone and Kohlhofer's phone.

{¶ 56} From 11:00 p.m. to midnight, Garcia's, Kohlhofer's 8775 phone, and Walker's 4908 phone were using different towers and different sectors, which were all "the towers that are surrounding in the middle of that, that 3015 Chase Street." Orlando concluded that, during this period, "if you look at those connections, again, we see that there are connections between those phones. So those phones have traveled now towards that general area, 507 Maumee. They left that area, traveled away, and now they are bouncing off different towers and sectors around that 3015 Chase Street and continuing to speak."

{¶ 57} Between midnight and 4:00 a.m. on December 4, Kohlhofer's phones and Walker's 4908 phone were "fairly stationary, still, in connection and staying close to that general area of 3015 Chase Street." Garcia's phone, while communicating with Kohlhofer's and Walker's phones, was using a tower near Seaman Road in Oregon. Orlando also looked at cellphone activity from 11:25 p.m. on December 4 to 1:07 a.m. on December 5. He found that Kohlhofer's 9020 phone and Walker's 4908 phone each used 18.

towers near 3015 Chase Street. Garcia's phone used two towers, one in Oregon and one near Detroit Avenue.

{¶ 58} On cross, Orlando said that a phone using the omnidirectional tower near 507 Maumee simply meant that the phone was "using that tower that provides coverage to that area including that residence." He was not able to pinpoint where the device was. Phones can store geolocation information that can be physically downloaded from the device, which could give more precise locations than the general areas he was able to provide. He was not given any geolocation information regarding this case. He admitted that he could not say that Walker was anywhere near 507 Maumee during the 10:00 to 10:40 timeframe, only that his device was moving south, southwest.

{¶ 59} Regarding the 10:40 to 11:00 p.m. timeframe when Orlando thought that the records were indicative of Kohlhofer's and Garcia's phones moving in the same direction, he admitted that he "can't pinpoint or say if they were together or apart, but [he] can say through the use of the towers they were moving in the same general direction during that time."

{¶ 60} Orlando clarified that voice contacts between cell phones could mean that one phone called the other and went to voicemail but did not have any actual communication with the other phone's owner. When he referred to contact or communication between the phones, he meant that "those devices either made an outgoing call to that other phone or received an incoming call from that other phone." He was unable to tell from the CDRs how long any voice calls between cell phones were. He said that the CDRs would note if a call went to voicemail.

19.

{¶ 61} Orlando did not physically look at any of the cell phone towers involved in this case because the murder happened two years earlier, so he could not say that the towers he might have seen in 2024 were the same towers that existed and were in the same condition as they were in 2022. Therefore, he did not know if a cell phone tried to connect to a different tower but was unable to because of mechanical failure. He was also unaware of any error or accuracy rates related to the towers. And he was unable to go out and measure the actual signals from the towers to provide "the actual footprint rather than just that sector." Orlando conceded that a phone might not always use the tower closest to it, but a phone would always be within the coverage area of the tower that it used.

{¶ 62} Cruz Garcia testified that the State charged him with aggravated murder, murder and kidnapping in the death of K.W. and K.P. In exchange for his truthful testimony, he entered guilty pleas to involuntary manslaughter and kidnapping.

Garcia admitted that prior to his December 15, 2022, arrest he lied to police multiple times regarding the events. Following his arrest and indictment, he again lied to police. Garcia stated he was truthful the fourth time speaking with police and he wanted the families to know what happened that night.

{¶ 63} The night that K.W. and K.P. disappeared, Garcia had gone out to dinner for a friend's birthday. After dinner, he went to buy marijuana in Michigan. When he got to his "weed man's" house, he got a video call from Gingrich, who showed him K.W. and K.P. tied up with their hands behind their backs in Gingrich's basement. He had tied them up because he caught them stealing a gun from his house. Garcia recognized K.W.

20.

as one of the people who tried to break into his mother's house. He also knew that Kohlhofer and Walker were looking for K.P. because they thought that K.P. and M.N. had broken into their homes on Chase Street in November and stolen marijuana, money, and guns, so he called Kohlhofer. Kohlhofer "tells [him] to get over there ASAP. Make sure they don't let them leave." As a result, Garcia left Michigan, went to his house on Seaman Road in Oregon to get his gun, and then went to Gingrich's house on Maumee Avenue.

{¶ 64} When Garcia arrived at Gingrich's house, he called Kohlhofer again to let him know that he had arrived and to give Kohlhofer the address. As he was waiting for Kohlhofer to get there, Gingrich took him to the basement. Gingrich and B.W. were in the basement with Garcia. Eames, Carrissa, and Gabe Garcia were elsewhere in the house. Garcia "confronted" K.W. and K.P. about trying to break into his mother's house. When they denied doing so, Garcia hit their heads with the handle of his gun. As he went to hit them a second time, K.P. claimed that his brother was the person who tried to break into Garcia's mother's house and asked Garcia to let them go. Garcia responded that "they have to take that up with Beezy when he gets here." Beezy is Kohlhofer's nickname. At 9:50 p.m., Kohlhofer texted Garcia, "I'm a send bro just tell me where[,]" which Garcia interpreted as Kohlhofer saying that he was going to send Walker. While waiting for Kohlhofer to arrive, Garcia pointed his gun at the boys so that they would not run away.

{¶ 65} Next, Kohlhofer called to tell Garcia that he was outside the Maumee Avenue house. Following Gingrich's instructions, Garcia told him to park in the alley

behind the house where there were no cameras.  He and Gingrich walked the boys, with their arms tied behind their backs, out the back door to the alley to meet Kohlhofer and Walker, who were standing by Walker's black Chevy Impala with the trunk open. Kohlhofer punched one of the boys, and Walker "smashed" the other with a pistol, causing them to fall, after which both stomped on the boys.  Walker then taped their mouths and hogtied their hands and legs.  At this point, Gingrich began to walk away, and Walker and Kohlhofer put the boys in the trunk of the Impala, which had a blue tarp in it.  Kohlhofer told Garcia that he needed to follow them.  Before leaving the house, Garcia gave his gun to Carrissa so that she could clean it because he thought that it had the boys' DNA on it.

{¶ 66} Garcia followed the Impala in his truck to Chase Street.  While they were driving, Garcia called Kohlhofer, who told him to stay behind the Impala so that it did not get pulled over.  During their conversation, Kohlhofer asked him how K.P. ended up at Gingrich's house and who knew that Kohlhofer was coming to get the boys.  Garcia told him that "everybody" knew he was coming over because Garcia had told the boy that "they had to take it up with Beezy when he gets here."  Kohlhofer was concerned that Walker would have to "go back through there" because people knew he was there, but Garcia assured him that Gingrich was "going to keep everyone quiet."

{¶ 67} Once they were on Chase Street and passed Kohlhofer's house, Garcia called him again to ask where they were going.  Kohlhofer told Garcia to go home and said "[h]e got it handled."  According to a text conversation with someone Garcia was buying shoes from, he was back at his house sometime after 11:17 p.m.

22.

{¶ 68} After he got home, Garcia got another video call from Gingrich. Gingrich was worried because the boys had unfriended him on Facebook and thought they might return to his house to retaliate. When Garcia called Kohlhofer to find out about the situation, Kohlhofer said, "tell Corbin not to worry about it. They are not going to do nothing. I already told you I will handle it. Tell him to worry about cleaning up over there."

{¶ 69} Sometime after noon on December 4, Garcia went to Kohlhofer's "to ask more about the night before." He asked if Kohlhofer and Walker had shot the boys because he had heard gunshots when he was driving home, which Kohlhofer denied. However, "Chuck said that he should have. The little n***** were tough. We can't believe they didn't tell us where the shit was. They really fought to the end and took that to the grave. . . . Brent interrupted and said, you guys need to shut the fuck up and act like none of this ever happened."

{¶ 70} Later that night, Kohlhofer and Walker arrived at Garcia's house to talk about their alibi. They wanted to go to Gingrich's to make sure that they had not left anything in the alley and that Gingrich would not say anything about the night before. Garcia assured them that Gingrich would keep quiet.

{¶ 71} The next day, Walker came back to Garcia's house to see if he had said anything about the other night because people were accusing Garcia of having the boys in his basement. When Walker left, Garcia called Kohlhofer, who assured him that he did not need to worry as long as he kept quiet. Soon after, Garcia learned from a friend that K.W.'s uncle wanted Garcia to let K.W. go. Garcia called Kohlhofer, who said he would

23.

"try to clear [Garcia's] name." Kohlhofer eventually told Garcia that he thought that Garcia was in the clear, and if he had known that one of the boys was related to the uncle, "he probably would have gotten his stuff back. It's too late." Kohlhofer offered to have Walker install security cameras at Garcia's house. While Walker was installing the cameras, a detective came to the house to speak with Garcia. After they left, Garcia called Kohlhofer to ask what to do. Kohlhofer told him, "you need to clean up over there" and "if [the police] had something on you they would have came and got you by now." Garcia "asked him maybe they could let them go. This shit is getting way out of hand, and that's when [Kohlhofer] said let them go? Them n***** been dead." The next day, Walker picked Garcia up from outside of an attorney's office to ask if the detectives had said anything about him or Kohlhofer. Garcia said they only asked about Gingrich.

{¶ 72} Attempting to hide his involvement, Garcia deleted text messages, phone calls, and posts from his phone. One Facebook post said, "We don't fw lames bums or theifs u N****s finished ✅." Garcia claimed that the post was directed at Eames and related to a "prior beef" between the two men because Eames owed him money for marijuana. He said that he deleted the post after a friend told him to because it sounded incriminating.

{¶ 73} Regarding the gun that he had on December 3, Garcia said that he eventually got it back from Carrissa, but after he got it home, he wrapped it in a plastic grocery bag and threw it in his garbage can.

24.

Garcia received a handwritten letter while in the county jail; he believed either Walker or Kohlhofer sent it. The letter, delivered by another inmate, contained threats regarding him testifying at trial. The court admitted the letter without objection.

{¶ 74} Garcia believed that Walker authored the letter because "one time before we got put keep separates on each other Chuck was threatening me through the gate at the holding tank before you come in." Walker had previously referred to Garcia as "Cruzito" which was in the letter. Garcia gave the letter to his attorney.

{¶ 75} Garcia denied murdering K.P. and K.W. He stated that the boys were both alive and getting into the trunk of Walker's Impala when he last saw them.

{¶ 76} Garcia admitted during cross-examination that he lied to the police about many things in his first interview, including saying that he suspected both boys of trying to rob his mother's house, and that he did not have a gun on him the night of December 3. In his most recent interview with the police, Garcia told them that the boys had plastic grocery bags on their heads when they came out of the basement, which he had not mentioned in his prior interviews. The bags were on their heads to prevent them from seeing where they were walking and who was around them, not because of blood. He could not remember if the boys were bleeding after he pistol whipped them. He did not know what happened to the cords used to tie up the boys after K.W. duct taped their hands and feet. In one of his police interviews, Garcia told the detectives that he did not know why he was following Walker's car that night, but in court, he said it was to prevent Walker from getting pulled over. Garcia denied changing his story in response to discovery but claimed that he just added more to it each time he spoke with the police.

25.

Garcia went to Gingrich's house on December 3 to get the truth out of the boys about who tried to rob his mother's house. Seeing K.W. wearing the same shoes as one of the people in the video footage he had of the would-be burglars confirmed for Garcia that K.W. was involved. He only pistol whipped each of the boys once because he "felt like that's all that took, you know, to make them tell [him] they broke into [his] mom's house." He claimed that K.P. told him that K.P.'s brother was the one who tried to break into Garcia's mother's house after Garcia hit him with a gun one time, but Walker later told him that the boys were tough, would not tell them anything, and "took that shit to the grave."

{¶ 77} Garcia made the deleted Facebook post around 10:15 a.m. on December 5, the morning of the fire. He maintained that the post was aimed at Eames (a white man), who owed him $150, despite including a racial slur generally directed at Black people, claiming "that's not literally like being a racial slur . . . that's slang for multiple people." He blamed the use of the plural form of the slur on typing the post on his phone. Although Garcia and Gingrich were both mad at K.W. that night, they were not mad enough to kill him. He also claimed that he went home to get his gun to protect himself. He again denied killing K.W. and K.P.

{¶ 78} Garcia thought that Kohlhofer was looking for K.P. because K.P. and M.N. had broken into Kohlhofer's house on Chase Street, and Kohlhofer had seen them on video breaking into the house. He was not aware that Kohlhofer did not have cameras at the Chase Street house or that nothing was actually stolen from the house. Garcia

26.

thought that Kohlhofer was "dumb enough to just do this right in his own backyard and call all this scrutiny and heat onto himself[.]"

{¶ 79} He denied telling Gingrich to use deer blood to cover up any of the boys' blood in the basement.

{¶ 80} Garcia admitted that he had been calling Kohlhofer for marijuana that day and that Kohlhofer's text of "I'm a send bro just tell me where" indicated that Kohlhofer was not going anywhere. Garcia contacted Gingrich about 20 minutes after the fire started to ask him if he was up and wanted to smoke.

{¶ 81} Garcia recently learned that a BCI handwriting expert concluded that Walker probably did not author the letter he received in jail.

{¶ 82} TPD Sergeant Roy Kennedy's involvement in the case followed the boys being officially reported as missing persons after not being seen by their parents since December 3. Family members had been receiving tips from various sources and reported their disappearance as uncharacteristic.

{¶ 83} Sergeant Kennedy learned that the boys had been to a birthday party at Maumee Bay State Park and that an Uber picked them up. The park surveillance video showed that the vehicle was a silver Chevy SUV. Using the Flock camera system, a license plate reader system where a car can be searched by license plate number by vehicle make, color, and any distinguishing features, Kennedy spent hours narrowing down the vehicle until he found it.

{¶ 84} Sergent Kennedy drove to the address listed on the vehicle's registration and got no answer. A neighbor verified that the resident drove a silver SUV. Sergeant

27.

Kennedy contacted the owner the next day. She relayed that the Uber system does not keep a record of the exact addresses of fares but that she recalled dropping him off at a house on Maumee Street in Toledo, Ohio.

{¶ 85} Based on this information and additional information gathered from family members, on December 9, 2022, officers obtained and executed a search warrant for 507 Maumee Street to search for the boys or any evidence related to their disappearance. A search of the basement uncovered one small piece of broken glass with what appeared to be blood.

{¶ 86} During the investigation Sergent Kennedy learned that the boys may have gone missing due to allegations of theft of marijuana and guns from the homes of Gingrich, Garcia, Kohlhofer, and Walker.

{¶ 87} Following the search, police arranged for Gingrich and his girlfriend, Carrissa, who resided at 507 Maumee, to be interviewed at police headquarters. Police searched the couple's phones which had largely been erased. On Gingrich's phone they found the information confirming the Uber from Maumee Bay State Park to his home on Maumee Street.

{¶ 88} Sergeant Kennedy also received information regarding Garcia's possible involvement so he and a uniformed police crew proceeded to his home in Toledo. They spoke with Garcia and his fiancée Diamond Rivera who indicated that on the night of December 3, they were at a birthday party at Texas Roadhouse. Though not relevant at that time, Charles Walker left out the front door while they were talking.

28.

{¶ 89} Garcia gave permission to search the home; they found nothing suspicious. Police later searched a second, unoccupied residence owned by Garcia and uncovered no substances consistent with blood or organic material.

{¶ 90} After meeting with police and FBI regarding the investigation, as an investigative tactic, they decided to get as many individuals potentially involved in the same building because it becomes more difficult to lie when faced with the uncertainty of what others are saying. Sergent Kennedy wanted to separately question Carrissa, Gingrich, C.L.Y., Carrissa and P.Y.'s mother, and B.W.

{¶ 91} On December 13, 2022, police conducted a full day of interviews. Sergeant Kennedy determined that the four were not being truthful. Their statements were inconsistent with each other's and did not match direct evidence already collected from cell phone records and cell towers. The four were charged with obstructing justice.

{¶ 92} A few days later, cadaver dogs alerted to 3015 Chase Street in Toledo where a vacant house that was heavily damaged by a fire on December 5, 2022. The boys' remains were found in the basement.

{¶ 93} Sergeant Kennedy testified that police seized a black Chevy Impala from 3046 Chase Street upon learning that it may contain evidence related to the boys' disappearance. With warrants, police seized cell phones from Gingrich, Eames, Garcia, Rivera, Kohlhofer, and Walker to perform cell phone extractions, collecting anything on the phone including call records, texts, photos, or notes. Search warrants were also issued to cell carriers for call records deleted from the phone as well as cell tower records which aid in determining where the phone was physically located during a call.

29.

{¶ 94} After December 15, 2022, Sergent Kennedy focused on interviewing or reinterviewing individuals regarding the events while Detective Marchyok led the investigation.

{¶ 95} During cross-examination, Sergeant Kennedy agreed that there was no forensic evidence demonstrating that the boys were alive when they left 507 Maumee. The trial court sustained an objection on hearsay and speculation to counsel's question regarding Kennedy's knowledge that a few individuals believed that the boys died at 507 Maumee.

{¶ 96} Gingrich testified that in exchange for his testimony the murder and kidnapping changes were reduced to involuntary manslaughter and kidnapping to which he entered guilty pleas. The State agreed to dismiss the remaining charges.

Gingrich stated that on December 3, 2020, he lived at 507 Maumee with his girlfriend, Carrissa Eames, and their three children. That day they hosted a gender reveal party for his niece from 4:00 to 7:00 p.m. During the party, he noticed a gun missing. He suspected that either Carrissa's brother, Eames, or K.W. had stolen it.

{¶ 97} K.W. dated Gingrich's niece; Gingrich suspected him because he recently left the house between 4:00 and 5:00 a.m., which was very unusual. Gingrich asked his 14-year-old nephew, B.W., to reach out to K.W. and see if he acted "funny." After making contact, B.W. told him that K.W. was thrown out of a party and stranded and asked Gingrich to send an Uber to pick them up. Gingrich agreed and saw it as an opportunity to confront K.W.

30.

{¶ 98} K.W. arrived at 507 Maumee around 8:30 to 9:00 p.m. with an individual he did not know. K.W., K.P., B.W., P.Y. (Carrissa's half-brother), and Eames were listening to music in the living room and then went to the basement to play video games.

{¶ 99} A short while later, Eames came upstairs from the basement to tell Gingrich that one of the boys was on a video call showing off a gun. Gingrich went to the basement and "confronted" K.W. about the gun. Specifically, Gingrich described a conversation in which he raised his voice and asked K.W. if he stole the gun, which K.W. denied. Gingrich noticed K.P. reaching for a gun. As K.P. pulled the gun, Gingrich "tackled him and started wrestling with him with the firearm." While they were wrestling, Eames hit K.P. in the head with a gun (that was not Gingrich's stolen gun). K.P. dropped his gun, and Eames picked it up. Eames then handed his gun to Gingrich, who gave it to P.Y. to take upstairs.

{¶ 100} Next, Gingrich continued the "conversation" about his missing gun. Eames suggested tying up K.P. and K.W. Gingrich did not have any rope, so he suggested using HDMI cables from the videogame systems. Eames used the cords to tie the boys' hands behind their backs. Gingrich claimed that they did so because they were "trying to control the situation and calm the situation." He could not explain why he did not stop Eames from tying up the boys.

{¶ 101} After the boys were restrained, Gingrich continued questioning K.W. about the missing gun, and K.W. continued denying that he stole it. Eventually, K.W. told Gingrich to call Garcia "to ask him if [K.W.] ever stole anything from him." Gingrich refused because Garcia suspected K.W. of breaking into his mother's house five

31.

or six months earlier. K.P. then told him to call Garcia because Garcia knew his dad and would "get everything figured out on his end." Gingrich relented because he did not know K.P. or his family and "didn't want to start a potential beef between [him] and [Garcia] about this kid being in [his] basement tied up."

{¶ 102} After unsuccessfully trying to reach Garcia two or three times, Gingrich asked Carrissa to call Diamond Rivera, Garcia's fiancée. Rivera passed the message to Garcia, who contacted Gingrich by video call.

{¶ 103} Gingrich told Garcia that he caught K.W. stealing and asked if Garcia knew K.P. When he confirmed that he did, Gingrich told him to "get ahold of [K.P.'s] people to figure out what is going on" because K.P. pulled a gun on Gingrich in Gingrich's house. Garcia disconnected the call but called back a couple of minutes later to tell Gingrich that he was coming over.

{¶ 104} Garcia arrived at Gingrich's house about 30 minutes later. When he got to the house, he went to the basement and "started pistol whipping [K.P.]" while saying, "I know that was you that broke into my mom's house. Cuz this is what happens when you steal." K.P. denied being involved in the attempted break-in and named other people who were involved, including his brother. Garcia moved on to hitting K.W. with the gun. When he went to hit K.P. again, Gingrich stopped him because he was "doing too much." After being struck with the guns, K.W. was bleeding a little bit along his hairline. Garcia told him to use a garbage bag like a rag to prevent the blood from getting anywhere.

{¶ 105} Next, Gingrich asked if "his" people were coming, and Garcia said that his ride was on the way. Garcia then continued to talk to the boys about who broke into

32.

his mother's house. During that conversation, K.P. asked if they could untie him. Garcia responded, "you gonna take that up with Beezy." Gingrich had met Beezy once but did not know his real name. K.P. commented, "I don't know what he wants with me. He knows I didn't have nothing to do with that shit."

{¶ 106} Shortly after this, Garcia received a phone call from someone telling them that they had arrived at the house. They called back once they were parked in the alley behind the house. At this point, the boys got up from the basement floor. K.W.'s hands were loosely tied, and Gingrich pulled the HDMI cord off of them. Then he, Garcia, and Gabriel walked the boys outside to a black Chevy Impala that was waiting in the alley. There were two men standing by the back end of the car. Gingrich recognized one as Beezy and identified the men in court as Kohlhofer and Walker.

{¶ 107} Garcia had been walking with K.P., who he pushed toward Kohlhofer. Kohlhofer "struck" K.P., who fell to the ground. Then Walker grabbed K.W. and punched him. After that, Gingrich heard Kohlhofer say to K.P., "nephew, what did I tell you about stealing[,]" and Walker began taping K.W.'s wrists. Then Gingrich and Gabriel walked back to the house.

{¶ 108} Once Gingrich was back in the house, either P.Y. or B.W. asked for the HDMI cord, so Gingrich called Garcia and asked him to bring the cord back when he was finished. About 10 minutes later, Garcia called back to say that he put the cord on a white car that was parked in the back yard.

{¶ 109} According to Gingrich, he "had a really bad vibe about the situation," and P.Y. was very shaken up, so he and Carrissa decided to go to Carrissa's mother's house.

33.

{¶ 110} Later that night, Garcia called Gingrich to tell him that he was home. On December 5 or 6, Carrissa learned that K.W. had unfriended her on Facebook, so Gingrich called Garcia to make sure everything was all right and he did not have to worry about the boys coming back to mess up his house. Garcia said, "everything was cool. But I'm going to call just to verify and make sure everything is cool." He called back later to confirm that "everything is cool. You don't got to worry about it." The next day, Gingrich began seeing the missing person posts, so he called Garcia again. In that conversation, according to Gingrich, Garcia first tried to

> down play the situation like everything is cool. You ain't got to worry about that. But I kind of was yelling at him, because people are starting to share my picture saying that I had something to do with their disappearance, and I'm the last person they've been with, and people are starting to come to my house.

> At that point then he had told me that, I ain't going to lie. Beezy did some bullshit, and that I needed to clean up over there and make sure there is no blood on the floor. If there is I need to go and get deer blood and dump the deer blood around my basement.

> . . .

> I stressed to him that I did not sign up for this. Do you not understand what we just got ourselves into?

Garcia told Gingrich to tell the police that he did not know anything if they came, to be safe, and keep his head on a swivel. Gingrich did not follow Garcia's deer blood advice because there was no blood on his basement floor.

{¶ 111} During this time, Gingrich was getting threats, and Garcia's house "got shot up," so Gingrich and Carrissa decided to leave their home to live in vacation rentals.

34.

The next time Gingrich had contact with Garcia was when Gingrich asked Garcia for some marijuana. As Gingrich was getting ready to go to Garcia's house, Garcia called Gingrich and said "to hold on, some weird shit is going on. I will call you when it's cool to come through." Garcia called back around 10:00 or 11:00 that night, but Gingrich did not go to Garcia's house because "[t]he situation felt fishy to [him]."

{¶ 112} The final time Gingrich had contact with Garcia before his arrest was when Garcia texted him around 2:00 a.m. asking if he was up and wanted to smoke. Gingrich did not respond to the message because "that situation felt fishy to [him]."

{¶ 113} Gingrich claimed that he did not murder K.P. or K.W. He last saw the boys in the alley behind his house, at which point they were alive and with him, Garcia, Gabriel, Kohlhofer, and Walker. He believed that they left with Kohlhofer and Walker.

{¶ 114} Gingrich acknowledged he told police during a January 11, 2023 interview that on December 3, 2022, two black men in masks pulled up in the alley behind his house. He also told this to Carrissa to protect her, believing the less she knew the better.

{¶ 115} At the June 28, 2023 interview with police, Gingrich changed his story stating that it was two masked white men and that he recognized Kohlhofer's voice. He eventually stated that they were not wearing masks.

{¶ 116} Gingrich admitted lying several times to police during his initial interview on December 9, 2022. At the December 13, 2022 interview Gingrich stated that the boys left with Garcia, who he knew and considered a friend. He acknowledged that he neither knew nor had loyalty to Kohlhofer or Walker.

35.

{¶ 117} Gingrich agreed that he collaborated with family, including minors, to fabricate a story to tell police. He also agreed that his attorney provided him with discovery as it was received and he could see what other people involved in the case were saying.

{¶ 118} Gingrich stated that he did not know what happened to the boys' cell phones. He denied throwing them in the water; he believed that Eames had the phones and the gun he took from K.P.

{¶ 119} Lead investigator TPD Detective Paul Marchyok was initially assigned to the case to aid in a missing persons investigation. After speaking with family members and reviewing Facebook messages, the screen shots of the Uber ride, and the Maumee Bay State Park surveillance footage, he executed a search warrant at 507 Maumee. During the search, police collected a small glass fragment with apparent blood from the basement. The DNA results did not link the blood to anyone involved in the case. They uncovered no other relevant DNA evidence.

{¶ 120} Following the December 9, 2022 interviews of Gingrich and Carrissa, Detective Marchyok compared their versions of the events with the Flock camera and cell phone data and statements of other individuals and determined that they were being untruthful. The pair signed a waiver allowing police to download the contents of their cellphones.

{¶ 121} On December 13, Detective Marchyok reinterviewed Gingrich and Carrissa as well as C.L.Y. and B.W. He determined they were being untruthful. The group was arrested and charged with obstructing justice.

36.

{¶ 122} Detective Marchyok testified that his next "major step" was "finding 3015 Chase Street." Police received information about the involvement of Garcia, Kohlhofer, and Walker and that the boys might be in the basement of a burned-out house that collapsed. Investigating Kohlhofer, Marchyok discovered that he owned several homes on Chase Street and that on December 5, a house on that street had burned down.

{¶ 123} On December 14, when Detective Marchyok arrived on Chase Street, he saw that the house had been demolished and also observed the three homes Kohlhofer owned. In front of one of the homes where Walker lived with his girlfriend, Rozlyn Lucas, Marchyok observed a black Chevy Impala that police had been looking for based on information received. Police towed the vehicle.

{¶ 124} Coordinating with the FBI, the next day an excavation crew and cadaver dogs were on site. The dogs alerted to human remains and the boys were found deceased in the basement. Police recovered surveillance video from a nearby home at 506 New York and one on Ontario Street, one block over.

{¶ 125} That day, Detective Marchyok briefly interviewed Garcia and Garcia's fiancée, Diamond Rivera. He obtained a search warrant for their home and Ford, F-150. He also interviewed P.Y. Marchyok stated that Rivera and P.Y. were not being truthful.

{¶ 126} Detective Marchyok testified that Garcia's attorney delivered a letter Garcia claimed he received in jail. A DNA analysis and a writing exemplar, after Walker provided a sample, were performed and the results were inconclusive. The inmate who delivered the note to Garcia would not disclose who gave it to him.

37.

{¶ 127} Through his investigation, Detective Marchyok developed a timeline of the initial events. On December 3, 2022, at 8:14 p.m., the boys get into a silver Chevy SUV at Maumee Bay State Park. At 8:52, they are at 507 Maumee. There was a video chat involving K.W. and then at 9:14 p.m., K.W. missed a call. At 9:28 p.m. there is a photo of the boys tied up in the basement. After no further communication from the boys, Marchyok continued his timeline by relying on the CAST mapping in FBI Agent John Orlando's report, the Flock cameras, and the home security camera footage from 506 New York.

{¶ 128} Walker's attorney objected just as the State began questioning Marchyok regarding Agent Orlando's CAST report. Counsel challenged Marchyok using or "rehashing" the testimony as he did not have Orlando's qualifications. The State claimed that Marchyok's testimony would be limited to whether during the course of his investigation, he found certain information in the CAST report to be significant. Overruling the objection, the trial court agreed that Detective Marchyok could testify as to how the report affected his investigation.

{¶ 129} Detective Marchyok first identified the account holders associated with the various cell phones which were seized pursuant to search warrants. Marchyok testified Agent Orlando's 9:00 to 10:00 p.m. map of the various cell phones and towers "matched up" with Garcia's testimony that he went to Michigan to buy marijuana. He also found the "I'm a send bro just tell me where" text from Kohlhofer to Garcia significant because it happened after at least four phone connections between the two men. He found Orlando's map of the phones from 10:00 to 10:40 p.m. significant

38.

because "[i]t shows movement of the phones and where people are going." Flock cameras, capturing images of the vehicle and license plate, also corroborated Walker's movement toward the 3000 block of Chase Street.

{¶ 130} Detective Marchyok testified that he reviewed home security camera footage from a house at New York Avenue and Chase Street. On December 3, 2022, at approximately 10:09 p.m., a dark-colored car believed to be Walker's Chevy Impala turns from New York Ave. onto Chase Street. It then backs up Kohlhofer's driveway at 3038 Chase. A second video clip showing that at 10:31 p.m., the Chevy pulls out of the driveway onto Chase, turning left onto New York which leads to Summit Street.

{¶ 131} Detective Marchyok explained that the time frames aligned with Agent Orlando's cell tower testimony showing Walker's cell phone moving along Summit Street through Downtown Toledo and the Middle Grounds and utilizing the tower covering the area of 507 Maumee and that "if he's in the area that is covered by 507 Maumee -- ." Walker's counsel objected to the testimony and moved for a mistrial arguing that it mischaracterized Agent Orlando's testimony and contravened the trial court's order that Marchyok not "opine about what the relevance of the various CAST data is[.]" Counsel stated that Agent Orlando's testimony did not conclude that the Middle Grounds tower covered 507 Maumee.

{¶ 132} The trial court denied the motion for a mistrial, sustained the objection, and struck the question and answer. The court cautioned against Detective Marchyok stating, as a fact, that Walker was in the Middle Grounds area when the data shows only that his phone was there. The court then instructed the jury:

39.

The Court is going to sustain the last objection. The last question of Ms. Koch and the answer given by Detective Marchyok are to be stricken from the record. Both the question and the answer are to have no use, and you are not to consider it as evidence, or at all in your deliberations in this case.

{¶ 133} The State then asked Detective Marchyok: "[C]an we agree to identify the vehicle we've been discussing as a vehicle consistent with Mr. Walker's black Chevy Impala?" Walker's counsel objected arguing that "[t]he terms consistent with implies that it was the same vehicle. He is not Superman. He doesn't have Xray vision. He can't read unreadable license plates. He can't see through glared windows to see who was operating the vehicle."

{¶ 134} While acknowledging that the parties previously agreed to the admissibility of testimony that the vehicle was "consistent" with Walker's, the court again sustained objection on the basis that the question was leading and that Marchyok "keeps stating things in factual terms rather than as part of my investigation we believed."

{¶ 135} Continuing with the surveillance video, around 11:03 p.m., two vehicles that Marchyok believed were Walker's Impala and Garcia's F-150 headed southbound on New York and turned from New York on to Chase. They both drive down Chase past Walker's house.

{¶ 136} On December 4, around 12:06 a.m., a dark-colored car drives down New York, turns on to Chase, and backs into Walker's driveway. Around 1:40 a.m., the motion-sensor light outside of Walker's house comes on, and soon after a person can be seen walking around the yard and down the alley beside 3015 Chase. Around 1:44 a.m.,

40.

what appears to be the same person walks out of the alley and crosses the street to the side of Chase where Kohlhofer's and Walker's houses are. Soon after, the motion-sensor light outside of Walker's house turns on again. Around 1:49 a.m., the light outside of Walker's house turns on and a person again walks from the direction of Walker's house toward 3015 Chase, turns down the alley beside 3015 Chase, and walks out of the frame. A few minutes later, the motion light turns on again and another person walks toward 3015 Chase from the direction of Kohlhofer's and Walker's houses and turns down the alley beside 3015 Chase. Around 2:00 a.m., two people walk out of the alley beside 3015 Chase, cross the street, and walk toward Kohlhofer's and Walker's houses. Soon after, the motion light outside of Walker's house turns on. A dark-colored car leaves Walker's house around 2:07 a.m. Around 2:17 a.m., a dark-colored car drives into the alley beside 3015 Chase. After the car is out of the frame, what appears to be brake lights reflect off the houses beside the alley. Around 2:22 a.m., a dark-colored car drives down Chase and backs into Walker's driveway.

{¶ 137} At 12:53 a.m. on December 5, there is a bright flash of light from the alley beside 3015 Chase. Shortly after, flickering light that quickly intensifies in brightness comes from the alley. Around 1:00 a.m., neighbors begin reacting to the fire. Police and fire crews soon arrive.

{¶ 138} Prior to Detective Marchyok's cross-examination and outside the jury's presence, the parties presented arguments regarding the admissibility of two marked defense exhibits, WB and WC, which were text messages taken from the ONIC report and generated by Cellebrite program. Both text strands involved Eames. The first

41.

exchange, which was Exhibit WB, began December 6 at 8:05 a.m., between Eames and his girlfriend and provided:

> Eames: Bro really ?)?  This shits foul bro
>
> Eames: Bro like wake tf up you really fell asleep and left me and forgot about me made me sleep were two people died and shit
>
> Eames: Please come get me a soon as you get up I miss you and love you so much I don't ever wanna be away from you I value your love alot and know we're your coming from
>
> Girlfriend: I'm up so you want me to come
>
> Girlfriend: I'm going backTo bed bro like you just don't know when to stop like fr
>
> Eames: I just got up I went to bed I'm sorry yes are you coming ?
>
> Eames: Pull in the back whebhere
>
> Girlfriend: I'm not staying so are you ready
>
> Eames: Your not gonna come in ?  I gotta wait for ris and Corey to get up to lock the door ?

{¶ 139} The second exchange, Exhibit WC, occurred on December 19 between Eames and an individual named Brown where discussing the incident Eames states: "Dey was at my sisters Cruz pick dem N****s up then they disappeared" and "They took a gun from by sister bf but ne ain't kill dem n***a all he did was turn up on [K.W.] cuz [K.W.] was like family and den they called Cruz to pick dem up then left wit him[.]"

{¶ 140} The State objected to the text messages because they were hearsay that did not fall within any hearsay exception.  As to the first text exchange, Walker and Kohlhofer argued that they were not offering the messages for the truth of the matter asserted (i.e., the mention of people dying at the house was "completely collateral" to the

42.

actual reason Eames sent the messages-to get picked up from a place where he did not want to be) and excluding the messages would prevent them from presenting a defense. The trial court ultimately decided that the messages were inadmissible hearsay and did not qualify as a statement of a party opponent, statement of a coconspirator, present sense impression, excited utterance, then existing mental state, or statement against interest.

{¶ 141} Detective Marchyok confirmed during cross-examination that no DNA profiles, not even Walker's were found in Walker's car. He did not see any evidence of Walker cleaning out his car on the video from the house on New York Avenue. He also confirmed that they did not get any DNA evidence from any of the other items they sent to BCI for testing. He did not know what results might have been on items that were not tested.

{¶ 142} Marchyok agreed that Garcia, Gingrich, Carrissa, Eames, P.Y., and B.W. (among others) lied about their involvement in the case at some point. He also confirmed that Gingrich, Carrissa, Eames, P.Y., and B.W. discussed what they would say if they were questioned by the police, and that Garcia's story kept evolving.

{¶ 143} The police did not have any video that showed something that looked like Walker's Impala in the area of 507 Maumee. Marchyok stated that there were no Flock cameras in that area in December 2022. Additionally, police "did not get any useable geo location data" from Walker's or Kohlhofer's phones. Any location data from other codefendants' phones did not put them in the 3000 block of Chase Street.

{¶ 144} Marchyok clarified that the houses with broken windows were the house on Patriot Street and Walker's house on Chase Street. There were no police reports filed

43.

regarding break-ins at Kohlhofer's Chase Street house, Walker's house, Garcia's mother's house, or regarding Gingrich's gun.

{¶ 145} Regarding the "I'm a send bro" text, Marchyok said that it can be inferred that Kohlhofer was going to send someone, not that he was going somewhere. Based on his investigation, he believed that Kohlhofer meant Walker because Walker went to 507 Maumee that night. Defense counsel again objected and moved for a mistrial as to Marchyok's characterization of Agent Orlando's testimony as placing Walker at 507 Maumee. The court overruled the objection, instructed counsel to move on, and instructed the jury to use their collective memories regarding what Agent Orlando said about the cell towers.

{¶ 146} Marchyok agreed that there was another Impala in the surveillance videos from Chase Street, but said that it was a lighter color, which showed up as lighter on the nighttime videos. He was convinced that Walker's Impala was on the video because it fit with the movements on his phone.

{¶ 147} Defense counsel then "renewed" the issue of the admissibility of the text messages between Eames and his girlfriend. The court again concluded that the texts were inadmissible hearsay.

{¶ 148} When the State rested, Walker's counsel moved for an acquittal pursuant to Crim.R. 29. The parties then presented further argument regarding the admissibility of the December 6, text exchange between Eames and his girlfriend. Defense asserted that in addition to being admissible under Evid.R. 804(B)(3), hearsay exceptions in Evid.R. 803 also allowed their admission.

44.

{¶ 149} The court rejected the application of the present sense impression, excited utterance, or then existing mental state exceptions under Evid.R. 803. The court then addressed the statement against interest exception under Evid.R. 804(B)(3) noting that the messages were not clearly against Eames' interest. Next, the court concluded that the texts lacked corroborating circumstances indicating their trustworthiness. The court noted that the messages between Eames and his girlfriend were at odds with the texts between Eames and Brown.

{¶ 150} After Marchyok testified, the State rested. The court denied Walker's Crim.R. 29 motion for acquittal.

### 4. Walker's Case

{¶ 151} Melanie Gard of the ONIC testified regarding her involvement in analyzing the cellphone extraction reports in this case. One analysis looked at the number of phone calls the codefendants' phone numbers made to each other during three periods: November 18 to December 2, 2022 (before the crime), December 3 to 5, 2022 (during the crime), and December 6 to 15, 2022 (after the crime). Gard was unable to say who was using the phones when they made the calls.

{¶ 152} On a timeline that Gard compiled, she noted that Walker's vehicle left his house on Chase Street at 10:05 p.m. on December 3.

{¶ 153} Kohlhofer's phones and Garcia's phones spent a total of about two minutes and forty-two seconds communicating with each other between 9:22 and 11:07 p.m. on December 3. Gard could not recall if she was asked to look at phone calls made earlier that day.

45.

{¶ 154} On cross-examination, the state asked Gard about several charts in her report. In the first three, she broke down the analysis of the number of phone calls the codefendants' phone numbers made to each other during the periods before, during, and after the crimes. The takeaways from these charts are (1) the group averaged 9.06 calls per day from November 18 to December 2, (2) it averaged 27.67 calls per day from December 3 to 5, and (3) it averaged 9.8 calls per day from December 6 to 15.

{¶ 155} In the fourth chart, Gard detailed the calls between codefendants' phones on December 3, 2022. The first call was a call from one of Gingrich's phones to Garcia's phone at 9:22 p.m. The last call was a call from Garcia's phone to the same Gingrich phone at 11:07 p.m. The chart also showed that both of Kohlhofer's phones placed outgoing calls to Garcia's phone over the course of the evening.

{¶ 156} The fifth chart showed several calls between Kohlhofer and Garcia beginning at 9:39 p.m.; a text from Kohlhofer to Garcia at 9:48 p.m. saying, "I'm a send bro just tell me where"; a phone call from Garcia to Kohlhofer at 9:50 p.m.; a phone call from Kohlhofer to Walker at 9:51 p.m.; a phone call from Walker to Garcia at 9:52 p.m.; a text from Garcia to Rivera at 9:57 p.m. telling her that he has to leave; and a note that surveillance footage shows a vehicle leaving the area of Walker's home at 10:06 p.m.

{¶ 157} The sixth chart detailed calls between the codefendants' phones on December 4 and 5, 2022. The first call was a call from one of Kohlhofer's phones to Garcia's phone at 12:23 a.m. The last call was a call from Rivera's phone to Garcia's phone at 5:58 p.m.

46.

{¶ 158} After Gard testified, Walker called Carrissa and Eames, but they each invoked their Fifth Amendment right to remain silent and right against self-incrimination.

{¶ 159} Walker then rested. Kohlhofer presented the testimony of his mother, Carla Koch; he then rested. Walker renewed his Crim.R 29 motion for acquittal which the court denied.

## B. The Verdict and Sentencing

{¶ 160} The jury found Walker guilty of the aggravated murder (Count 2), murder (Count 4), and kidnapping (Count 6) of K.W. and guilty of K.P.'s murder (Count 3) and kidnapping (Count 5) but acquitted him of aggravated murder (Count 1). At sentencing, the trial court merged Counts 2, 4, and 6 and the State elected to proceed on Count 2 and the court merged Counts 3 and 5 with the State electing to proceed on Count 3. The court then sentenced Walker to a life sentence on Count 2 and 15 years to life imprisonment on Count 3. This appeal followed.

## II. Assignments of Error

{¶ 161} Walker raises eight assignments of error on appeal:

**ASSIGNMENT OF ERROR I**: The trial court erred in refusing to admit exculpatory evidence through improper application of Evid.R. 804(B)(3), which resulted in a violation of Mr. Walker's due process right to present a defense. *Chambers v. Mississippi*, 410 U.S. 284, 302, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973).

**ASSIGNMENT OF ERROR II**: The trial court erred over objection and Mr. Walker's due process rights to present a defense and confront the witnesses against him when it refused to admit non-hearsay evidence based upon the known fact that Don Eames was communicating about the victims being dead at 507 Maumee prior to the bodies being found, and otherwise restricted cross-examination based upon an errant view of the hearsay rules.

47.

**ASSIGNMENT OF ERROR III**: The trial court erred in Mr. Walker's right to a fair trial and to present a defense when the trial court permitted multiple instances of hearsay to be admitted against Mr. Walker over objection, in violation of Mr. Walker's confrontation rights.

**ASSIGNMENT OF ERROR IV**: Trial counsel failed to provide adequate representation under the United States 6th Amendment and Sect. 1, Art. 10 of the Ohio Constitution through a failure to engage in cross-examination, present a defense, and preserve issues for review.

**ASSIGNMENT OF ERROR V**: The trial court erred in denying Mr. Walker's requests for a mistrial when Detective Marchyok repeatedly offered improper, and prejudicial conclusory testimony that contradicted the state's cell-phone tower expert witness, Agent Orlando.

**ASSIGNMENT OF ERROR VI**: The trial court erred in failing to issue sufficient curative instruction to rebut the prejudicial harm of Detective Marchyok's inaccurate statements regarding the cell tower evidence and further erred by not sustaining very similar testimony when offered again by Detective Marchyok on cross-examination by counsel for Mr. Walker's co-defendant.

**ASSIGNMENT OF ERROR VII**: The convictions were insufficient of evidence and contrary to the manifest weight of the evidence contrary to Mr. Walker's due process and due course of law rights under the Ohio and United States Constitutions.

**ASSIGNMENT OF ERROR VIII**: The cumulative effect of the errors, whether found to be individually harmless or not, cumulatively such that the trial was unfair and the convictions were contrary to Mr. Walker's right to a fair trial and due process.

## III. Analysis

**A. The trial court improperly excluded Eames' December 6 text messages, but the error was harmless.**

{¶ 162} Walker's first and second assignments of error raise various challenges to the trial court's exclusion of the text exchange between Eames and his girlfriend.[3] To restate, when attempting to get his girlfriend to pick him up from 507 Maumee, he texted that she "made me sleep where two people died and shit[.]"

{¶ 163} Walker agrees that if offered for its truth the texts between Eames and his girlfriend are hearsay because the author of the statement did not testify but asserts its admissibility under the statement against interest exception in Evid.R. 804(B)(3).

{¶ 164} Evid.R. 802 specifically provides that hearsay is not admissible thus, a trial court does not have discretion to admit hearsay. *State v. Richcreek*, 2011-Ohio-4686, ¶ 29, 32 (6th Dist.). "Ordinarily, we review a trial court's hearsay rulings for an abuse of discretion." *State v. McKelton,* 2016-Ohio-5735, ¶ 97, citing *State v. Hymore,* 9 Ohio St.2d 123, 128 (1967). Whether evidence constitutes inadmissible hearsay is a question of law subject to de novo review only if the ruling implicates the Confrontation Clause. *Id.*, citing *United States v. Henderson,* 626 F.3d 324, 333 (6th Cir.2010). Because Walker does not challenge the evidentiary ruling based on the Confrontation Clause, the abuse of discretion standard applies. An abuse of discretion occurs when the trial court's decision is unreasonable, arbitrary or unconscionable. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983).

---

[3]Walker attempted to use two sets of text messages as evidence at trial and proffered them into the record: (1) texts between Eames and his girlfriend, and (2) texts between Eames and a contact named Brown. Because Walker does not make any arguments regarding the "Brown" text messages, those messages are not addressed in our analysis.

49.

{¶ 165} Walker claims that Eames' "where two people died" statement was admissible under Evid.R. 804(B)(3), as a statement against interest. The section provides:

> A statement that was at the time of its making so far contrary to the declarant's pecuniary or proprietary interest, or so far tended to subject the declarant to civil or criminal liability, or to render invalid a claim by the declarant against another, that a reasonable person in the declarant's position would not have made the statement unless the declarant believed it to be true. A statement tending to expose the declarant to criminal liability, whether offered to exculpate or inculpate the accused, is not admissible unless corroborating circumstances clearly indicate the truthworthiness of the statement.

{¶ 166} Evid.R. 804 provides for the admission of the statement of an unavailable declarant under certain circumstances. The declarant must first be considered unavailable which includes situations where a declarant "[p]ersists in refusing to testify concerning the subject matter of the declarant's statement despite an order of the court to do so[.]" Evid.R. 804(A)(2). A declarant asserting his Fifth Amendment privilege against self-incrimination is considered "unavailable" under the rule. *State v. Rafferty*, 2013-Ohio-1585, ¶ 15 (2d Dist.), citing *State v. Sumlin,* 69 Ohio St.3d 105, 108 (1994).

{¶ 167} The rule further provides that the statement must tend to expose the declarant to civil or criminal liability and in cases of possible criminal liability it requires that corroborating circumstances clearly indicate the trustworthiness of the statement. Evid.R. 804(B)(3). The rule's requirements

> address[] one of the principal concerns of cases such as *Chambers [v. Mississippi*, 410 U.S. 284, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973)] which is that a criminal defendant's reliable evidence should not be excluded through application of hearsay rules that do not adequately protect due

50.

process rights. Evid.R. 804(B)(3) strikes a balance between hearsay statements against penal interest which are sufficiently trustworthy to be admissible and those which are not.

*State v. Swann*, 2008-Ohio-4837, ¶ 30.

{¶ 168} Here, it cannot be said that Eames' statements were "in a very real sense self-incriminatory." While he expressed knowledge of the deaths of the two boys, his statements, if they bore any real relationship to reporting that two people died at the house, do not suggest that he had any involvement in their deaths. If anything, the statement could be considered an attempt to minimize any involvement by expressing his displeasure in having to stay at the house. There is also no indication that Eames would have any concern regarding potential criminal liability for failure to report the crime to police. As the State noted, the record contained evidence that Eames pistol whipped the boys and tied them up with HDMI cables. Thus, someone in his position would not likely express concern over failing to report criminal activity.

{¶ 169} As to the corroboration requirement, "a bare showing of some extent of corroboration is not enough. Instead, the rule contemplates a demonstration of corroborating circumstances . . . which, on balance, persuade the trial judge that the statement bears the clear indicia of reliability and trustworthiness, leaving the ultimate determination of credibility to the jury." *State v. Saunders*, 23 Ohio App.3d 69, 73 (10th Dist. 1984).

In this instance, Walker sought to admit what he believed to be exculpatory evidence pursuant to his due process right to a fair trial. "A different rule applies when a defendant seeks to exonerate himself by asserting a right under the Due Process Clause to

51.

introduce a declarant's statement against interest." *State v. Durant*, 2004-Ohio-6224, ¶ 19 (2d Dist.).

> In the due process context, the Ohio Supreme Court has recognized that relevant corroborating circumstances include not only those surrounding the actual making of the statement but also any other corroborating evidence. [*State v.*] *Yarbrough*, 95 Ohio St.3d [227, ] 238, 767 N.E.2d 216, fn. 2 ("Although 'the fact that other evidence corroborates the statement is irrelevant' to the Confrontation Clause analysis when the state attempts to introduce a statement against interest * * *, the same is not true when the defense attempts to introduce such a statement as a matter of due process"); *see, also, Chambers* [*v. Mississippi*] (1973)], 410 U.S. at 300, 93 S.Ct. 1038, 35 L.Ed.2d 297 (relying in part on the fact that third-party confessions were corroborated by "some other evidence in the case" to find that the defendant had a due process right to introduce the confessions).

*Id.*

{¶ 170} On review, the testimony presented at trial or proffered by Walker contradicted the statement in the text that the boys died at 507 Maumee. Garcia, Gingrich, and P.Y. all testified that the boys were alive when they left the home. Walker's own proffered exhibit, WC, contained text messages stating that Garcia picked up the boys and then they disappeared.

{¶ 171} The trial court spent a considerable amount of time entertaining the arguments of the parties and independently researching the issue before concluding that the texts at issue were either not against interest or lacked the necessary corroboration. In sum, this court cannot find that the ruling was an abuse of the court's discretion.

{¶ 172} Walker further contends that the text exchange was admissible as an excited utterance under Evid.R. 803(2) which provides an exception for out-of-court

52.

statements "relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition."

> "In order '[f]or an alleged excited utterance to be admissible, four prerequisites must be satisfied: (1) an event startling enough to produce a nervous excitement in the declarant, (2) the statement must have been made while still under the stress of excitement caused by the event, (3) the statement must relate to the startling event, and (4) the declarant must have personally observed the startling event.' (Citations omitted.)"

*State v. Bonner*, 2023-Ohio-4003, ¶ 59 (6th Dist.), quoting *State v. Richardson*, 2010-Ohio-471, ¶ 62 (6th Dist.).

**{¶ 173}** Walker claims that Eames' texts were admissible under Evid.R. 803 as a startling event because of Eames' involvement in the death of two boys within the preceding 48 hours and waking up in a house where he was involved in a murder less than 48 hours ago. The State counters that a three-day gap between the events and the texts provided time for Eames' excitement to subside.

**{¶ 174}** On review, the gap between the events and the texts allowed any excitement to wane. Further, after making the statement to his girlfriend Eames went to sleep for three hours, which belies the assertion that he was under the stress of a startling event. The text exchange, thus, was not admissible under the excited utterance hearsay exception.

**{¶ 175}** Walker's second assignment of error contends that the trial court erred by excluding the same text messages for non-hearsay purposes; specifically, to explain the course of the police investigation.

> "Testimony to explain police conduct is admissible as nonhearsay if it satisfies three criteria: (1) the conduct to be explained is relevant,

53.

equivocal, and contemporaneous with the statements, (2) the probative value of the statements is not substantially outweighed by the danger of unfair prejudice, and (3) the statements do not connect the accused with the crime charged." [*State v.]Beasley*, [153 Ohio St.3d 497] at ¶ 172, citing *State v. Ricks*, 136 Ohio St.3d 356, 2013-Ohio-3712, 995 N.E.2d 1181, ¶ 27.

*State v. Thompson*, 2021-Ohio-1344, ¶ 35 (6th Dist.).

{¶ 176} Here, defense cross-examination of Detectives Marchyok and Kennedy regarding Eames' text to his girlfriend would have been proper nonhearsay when used to elicit the impact it had on the course of the police investigation. *State v. Manuel*, 2025-Ohio-1582, ¶ 32 (6th Dist.), citing *State v. Farris*, 2022-Ohio-3584, ¶ 26 (6th Dist.); *State v. Winters*, 2013-Ohio-2370, ¶ 61 (6th Dist.). The trial court erred by preventing the defense from inquiring about the text messages in this regard.

{¶ 177} This error was harmless, however. Harmless error is "[a]ny error, defect, irregularity, or variance which does not affect substantial rights . . . ." Crim.R. 52(B). The state bears the burden of proving that an error did not affect a defendant's substantial rights. *State v. Moore*, 2021-Ohio-765, ¶ 37 (6th Dist.), citing *State v. Morris*, 2014-Ohio-5052, ¶ 23. An error by the trial court in excluding evidence "is harmless 'if such evidence would not negate the overwhelming proof of defendant's guilt.'" *State v. Johnson*, 2011-Ohio-994, ¶ 64 (3d Dist.), quoting *State v. Gilmore,* 28 Ohio St.3d 190, 193 (1986); *State v. Smith*, 2013-Ohio-746, ¶ 20 (3d Dist.) ("The improper exclusion of evidence is harmless where the remaining evidence provides overwhelming proof of a defendant's guilt."). In other words, the error is harmless "'if the jury would not have rendered a different verdict had the excluded evidence been admitted at trial[.]'" *State v.*

54.

*Fudge*, 2018-Ohio-601, ¶ 40 (10th Dist.), quoting *State v. West*, 2006-Ohio-6259, ¶ 9 (10th Dist.).

{¶ 178} In this case, the jury would not have returned a different verdict if Walker had been allowed to question Marchyok about Eames' text message claiming that he slept "were two people died and shit." Contradicting that single piece of evidence was (1) Gingrich's testimony that Walker was one of the two people who took the boys from his house; (2) Garcia's testimony that Walker was one of the two people who took the boys from Gingrich's house; (3) cell tower and video evidence that corroborated parts of Garcia's story; (4) Flock camera evidence showing Walker's and Garcia's cars during the relevant time period (5) video evidence of two people walking from the area of Walker's house and walking around 3015 Chase Street the morning of December 4, just hours after the boys were kidnapped; and (6) video evidence of a dark-colored car driving from Walker's house to the alley beside 3015 Chase Street the morning of December 4, just hours after the boys were kidnapped. Considering all of this, the trial court's exclusion of the text messages was harmless beyond a reasonable doubt. *See also State v. Kohlhoffer*, 2025-Ohio-5021, ¶ 216-222 (6th Dist.), where this court rejected a similar claim raised by Walker's codefendant.

{¶ 179} Based on the foregoing, Walker's first and second assignments of error are not well-taken.

**B. Walker's Confrontation Clause rights were not violated by the admission of objected to police statements.**

{¶ 180} In his third assignment of error, Walker claims that the trial court violated his confrontation rights by allowing, over objection, the admission of multiple instances of hearsay. The State counters that because Walker failed to raise a Confrontation Clause claim in the trial court, he must demonstrate plain error which he cannot do.

{¶ 181} Evidentiary rulings admitting hearsay and implicating the Confrontation Clause are generally reviewed de novo. *State v. Sproles*, 2023-Ohio-3403, ¶ 22 (6th Dist.) citing *McKelton*, 2016-Ohio-5735, at ¶ 97; *State v. Ford*, 2021-Ohio-3058, ¶ 21 (6th Dist.). Where, however, a defendant fails to raise a Confrontation Clause issue with respect to particular evidence, he has waived all but plain error. *State v. Shepherd*, 2020-Ohio-3915, ¶ 31 (3d Dist.), citing *McKelton*, at ¶ 191. Plain error is defined as only those errors that affect substantial rights. Crim.R. 52(B). Under the plain error standard, the court may reverse only if it is clear that the defendant would not have been convicted in the absence of the allegedly improper conduct. *State v. Searfoss,* 2019-Ohio-4619*,* ¶ 142 (6th Dist.).

{¶ 182} The Confrontation Clause of the Sixth Amendment to the United States Constitution provides, "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him[.]" "Admission of an out-of-court statement of a witness who does not appear at trial is prohibited by the Confrontation Clause if the statement is testimonial unless the witness is unavailable and the defendant had had a prior opportunity to cross-examine the witness." *State v. Jones*, 2012-Ohio-5677, ¶ 137, citing *Crawford v. Washington*, 541 U.S. 36, 54 (2004). "The Confrontation Clause applies only to 'testimonial statements.'" *State v. Beasley*, 2018-Ohio-493, ¶ 181,

56.

citing *State v. Muttart*, 2007-Ohio-5267, ¶ 59. A testimonial statement is defined as one "made with 'a primary purpose of creating an out-of-court substitute for trial testimony.'" *Id.*, quoting *State v. Montgomery*, 2016-Ohio-5487, ¶ 87.

{¶ 183} Walker contends that the trial court erred by allowing Detective Marchyok to testify, over objection, regarding "information" from an unidentified source connecting Walker to the crimes. Such information included receiving information about Walker's involvement and that the boys might be in the basement of a burned-out house. Marchyok stated that the information regarding the house "matched up." Marchyok stated that police were "already looking for a black Impala due to statements made to us."

{¶ 184} As previously set forth, statements offered to explain the course of a criminal investigation are not considered hearsay where they are not offered for their truth. *Manuel*, 2025-Ohio-1582, at ¶ 32, citing *Farris*, 2022-Ohio-3584, at ¶ 26; *Winters*, 2013-Ohio-2370, at ¶ 61.

{¶ 185} Upon review, there is no indication that the challenged statements were anything more than tips police received during the course of the investigation. Accordingly, the court did not err in admitting them under either abuse of discretion or plain error review. Walker's third assignment of error is not well-taken.

**C. Walker was not denied the effective assistance of counsel.**

{¶ 186} In his fourth assignment of error, Walker contends that his trial counsel ineffectively failed to fully cross-examine witnesses, present a defense, or preserve issues for appellate review. The State counters that Walker's counsel was not obligated to make meritless objections having no bearing on the outcome of the case.

57.

{¶ 187} The United States Supreme Court, in *Strickland v. Washington*, 466 U.S. 668, 687 (1984), established a two-step process for evaluating an allegation of ineffective assistance of counsel:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

{¶ 188} In other words, "'the defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" *State v. Bradley*, 42 Ohio St.3d 136, 142 (1989), quoting *Strickland* at 694. The defendant's failure to demonstrate either deficiency or prejudice will defeat a claim for ineffective assistance of counsel. *Strickland* at 687.

{¶ 189} Further, "[j]udicial scrutiny of [trial] counsel's performance must be highly deferential." *Id.* at 689. "A fair assessment of [trial counsel's] performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Id.* Due to "difficulties inherent in making the evaluation, a [reviewing] court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" (Citation omitted). *Id.*

58.

{¶ 190} Generally, debatable trial tactics "do not constitute a deprivation of effective counsel." *State v. Phillips*, 74 Ohio St.3d 72, 85 (1995). Furthermore, "'[f]ailure to do a futile act cannot be the basis for claims of ineffective assistance of counsel, nor could such a failure be prejudicial.'" *State v. Henderson*, 2007-Ohio-2372, ¶ 42 (8th Dist.), quoting *State v. Shannon*, 1982 WL 5057 (9th Dist. June 16, 1982).

{¶ 191} Walker first asserts trial counsel's ineffectiveness in failing to object to Marchyok's statements regarding the "inconclusive" photographic evidence of a vehicle as Walker's Impala. The State notes that counsel could have reasonably decided not to draw attention to the testimony but to rely on cross-examination.

{¶ 192} "The failure to object to evidence is not per se ineffective assistance." *State v. Percy*, 2017-Ohio-1224, ¶ 19 (6th Dist.), citing *State v. Conway*, 2006-Ohio-2815, ¶ 103. The decision to object is generally seen as part of trial strategy. *State v. Hartman*, 93 Ohio St.3d 274, 296 (2001).

{¶ 193} During Detective Marchyok's cross-examination, counsel questioned him regarding the lack of any DNA evidence in Walker's Impala, the fact that no video evidence put the vehicle in the vicinity of 507 Maumee on December 3, and the fact that his vehicle captured on a Flock camera in the area of his home was expected. Thus, counsel's failure to object to Detective Marchyok's testimony was trial strategy.

{¶ 194} Walker also claims counsel's ineffectiveness in the failure to pursue the admission of the text messages between Eames and his girlfriend as impeachment evidence. As the State correctly notes, the use of facts not in evidence would have drawn an objection which the court would have sustained.

59.

{¶ 195} Walker further contends that counsel was ineffective by failing to raise a Confrontation Clause argument as to Detective Marchyok's objected to testimony. Based on our disposition of Walker's third assignment of error, this argument is not well taken.

{¶ 196} Walker finally contends that counsel was ineffective by failing to challenge the overly prejudicial nature of the objected to testimony under Evid.R. 403(A) which provides: "Although relevant, evidence is not admissible if its probative value is substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury."

{¶ 197} Walker claims unfair prejudice in the fact that "an independent source implicated Mr. Walker" yet was not subject to cross-examination. Again, the information was not testimonial in nature and the argument is rejected.

{¶ 198} Upon review, the court cannot conclude that had counsel objected to the statements at issue, the result of the proceedings would have been different. Walker's fourth assignment of error is not well-taken.

**D. The court's denial of Walker's motion for a mistrial was not erroneous.**

{¶ 199} Walker's fifth and sixth assignments of error relate to objections raised during Detective Marchyok's testimony that Walker was in the vicinity of 507 Maumee because his cellphone used the tower closest to the address. Out of the jury's hearing, the parties debated whether Marchyok's testimony aligned with, misrepresented, or contradicted Agent Orlando's. The court ultimately sustained the objection but denied defense counsels' motion for a mistrial and instructed the jury that "[b]oth the question

60.

and the answer are to have no use, and you are not to consider it as evidence, or at all in your deliberations in this case."

Subsequently, during Kohlhofer's counsel's cross-examination of Detective Marchyok he stated that the CAST report "puts Charles Walker's phone in the area of 507 Maumee." Walker's counsel objected and again moved for a mistrial. After discussion between the parties, the court noted:

> I'm not going to grant a mistrial. I don't think that this is such that it prejudices this jury. This jury has, I'd say, quite a pedigree, each one of them. I think that they certainly can remember of [sic] the evidence that they heard and recall what was said.
> I think that the distinction – I remember both things that you guys are talking about that Detective Orlando talked about. This isn't much different than that report in that we have two different takes on one piece of evidence
> That doesn't mean it's wrong, okay? It doesn't mean they are misleading the jury. You can follow up. You can get Detective Orlando's report and show him, you know, where the cell phone is or the tower is. But I am going to overrule the objection.

{¶ 200} The court then instructed the parties to move on and the jury to use their collective memories "to know exactly what [Agent Orlando] said about those cell towers."

{¶ 201} A trial court's decision denying a mistrial is reviewed under an abuse of discretion standard. *State v. Durst*, 2020-Ohio-607, ¶ 46 (6th Dist.); *State v. Sage*, 31 Ohio St.3d 173, 182 (1987). "A mistrial is only proper 'when the ends of justice so require and a fair trial is no longer possible.'" *State v. Cantrill*, 2020-Ohio-1235, ¶ 47 (6th Dist.), quoting *State v. Franklin*, 62 Ohio St.3d 118, 127 (1991). Mistrials are "an

61.

extreme remedy." *Cantrill* at ¶ 47, citing *State v. Rossbach*, 2011-Ohio-281, ¶ 39 (6th Dist.), citing *Franklin* at 127.

{¶ 202} Upon review, Detective Marchyok's statement that "if [Walker's] in the area that is covered by 507 Maumee" was improper; however, it did not warrant a mistrial. As the State notes, the statement was conditional and interrupted by an objection. Marchyok's second statement, that Walker's phone was in the area of 507 Maumee also did not warrant a mistrial. The trial court observed that "there were two different takes on" Agent Orlando's testimony, that it did not mean that the State "was misleading the jury," and that jury could recall the evidence they heard.

{¶ 203} Considering the entire record, Marchyok's testimony did not prejudicially impact Walker's ability to have a fair trial. The trial court did not abuse its discretion by denying the request for a mistrial.

{¶ 204} Walker's sixth assignment of error claims that the trial court issued an insufficient curative instruction to lessen the impact of the prejudicial testimony. He claims that the instruction followed "a significant duration of time," involved significant testimony in a case with no physical evidence, and was undercut by the subsequent overruling of an objection as to "near-identical" testimony.

{¶ 205} A jury is presumed to follow the court's instructions. *State v. Peabody*, 2024-Ohio-185, ¶ 53 (6th Dist.), quoting *State v. Clinton*, 2017-Ohio-9423, ¶ 52.

> Moreover, a jury is presumed to follow the court's curative instructions concerning improper comments. *See State v. Ahmed*, 103 Ohio St.3d 27, 2004-Ohio-4190, 813 N.E.2d 637, ¶ 93 (stating that the jury can be presumed to have followed the court's instructions to disregard testimony). This presumption can be rebutted, however, by a showing that "the

62.

evidence could not have been ignored and that serious prejudice likely occurred." *State v. Westwood*, 4th Dist. Athens No. 01CA50, 2002-Ohio-2445, ¶ 42 (citation omitted).

*State v. Loyd*, 2021-Ohio-4508, ¶ 13 (6th Dist.).

{¶ 206} First, there is no indication that an inordinate time passed between the objection and the court's curative instruction. The trial transcript shows the parties discussion over two-and-one-half pages before the court addresses the jury. Further, while the case rests heavily on circumstantial evidence, such evidence is given the same weight and value as direct or physical evidence. *State v. Rutledge*, 2025-Ohio-4573, ¶ 73(6th Dist.). Finally, as stated above, Marchyok's subsequent testimony did not undermine the court's instruction. Accordingly, there is no indication that the jury failed to ignore the testimony or that serious prejudice occurred. *Loyd* at ¶ 13.

{¶ 207} Because Walker has not demonstrated that the court abused its discretion in denying his motion for a mistrial or that he was denied his due process right to a fair trial, his fifth and sixth assignments of error are not well-taken.

**E. Walker's convictions are supported by sufficient evidence and are not against the weight of the evidence.**

### 1. Sufficiency

{¶ 208} Walker first urges the court to re-adopt a prior standard that the Ohio Supreme Court explicitly overruled in 1991. The standard required that where a conviction is based solely on circumstantial evidence, the State demonstrate that the evidence is "irreconcilable with any reasonable theory of an accused's innocence in order to support a finding of guilt." *State v. Kulig*, 37 Ohio St.2d 157 (1974), syllabus.

63.

{¶ 209} Overruling *Kulig*, the Ohio Supreme Court examined the sufficiency standard in depth deciding that "[c]ircumstantial evidence and direct evidence inherently possess the same probative value and therefore should be subjected to the same standard of proof." *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph one of the syllabus. As such, "[w]hen the state relies on circumstantial evidence to prove an essential element of the offense charged, there is no need for such evidence to be irreconcilable with any reasonable theory of innocence in order to support a conviction." *Id.* Moreover, on appeal, "[a]n appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt." *Id.* at paragraph two of the syllabus. To that end, "[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *Id.* This remains the sufficiency standard in Ohio.

{¶ 210} This court recently rejected the same argument noting that stare decisis

'"compels a court to recognize and follow an established legal decision in subsequent cases in which the same question of law is at issue."' [*State v. Williams*, 2024-Ohio-1433, ¶ 17] quoting *State v. Henderson*, 161 Ohio St.3d 285, 2020-Ohio-4784, 162 N.E.3d 776, ¶ 28. We are bound by stare decisis to apply the legal standard adopted by the Ohio Supreme Court. Any change to the legal standard must come from the Ohio Supreme Court.

*State v. Garibaldo*, 2025-Ohio-1093, ¶ 68 (6th Dist.).

64.

{¶ 211} The State tried Walker on charges of aggravated murder, murder, and kidnapping. A kidnapping charge under R.C. 2905.05(A)(3) required that the State prove that Walker removed K.W. and K.P. "by force, threat or deception" to "terrorize, or inflict serious bodily physical harm on the victim or another." The murder charges required proof that Walker purposely caused the deaths of K.W. and K.P., R.C. 2903.02(B), with aggravated murder, R.C. 2903.01(B), requiring a showing that Walker kidnapped the boys intending to kill them.

{¶ 212} During trial, the State presented evidence that Walker and Kohlhofer assaulted the boys, restrained them, and placed them in Walker's Impala's trunk. A rational trier of fact could have found the kidnapping elements beyond a reasonable doubt.

{¶ 213} As to the murder charges, the State presented testimony that no one saw the boys after they were driven off in Walker's trunk. The next day, Garcia testified that Walker told him that the boys were tough and that "[w]e can't believe they didn't tell us where the shit was. They really fought to the end and took that to the grave." Gingrich identified Walker and Kohlhofer at trial and testified that he believed the boys left with them. The boys were found in a burned out, abandoned house near where Walker resided and where Garcia followed Walker's vehicle. The coroner testified that the boys' manner of death was homicide; K.W.'s cause of death was strangulation while K.P.'s was undetermined. Garcia received a note in jail where the author referred to him as "Cruzito," the name Walker had used when speaking with him. The State, thus, presented sufficient evidence to convict Walker of murder and aggravated murder

65.

## 2. Manifest Weight

{¶ 214} Walker next claims that his convictions were against the weight of the evidence because they were based on information received by police from an unidentified source during their investigation. There was no DNA evidence demonstrating that the boys were ever in his Impala's trunk. And the court prevented him from cross-examining police regarding the "where two people died" text messages. The State responds that the alleged deficiencies do not support the contention that the jury lost its way by believing the evidence presented by the State.

{¶ 215} When reviewing a manifest weight claim, "'[t]he court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.'" *State v. Lang*, 2011-Ohio-4215, ¶ 220, quoting *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997). "'The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction.'" *Id.*, quoting *Thompkins* at 387.

{¶ 216} An appellate court must "'extend special deference to the fact-finder's credibility determinations given that it is the finder of fact who has the benefit of seeing the witnesses testify, observing their facial expressions and body language, hearing their voice inflections, and discerning qualities such as hesitancy, equivocation, and candor.'" *State v. Carter*, 2024-Ohio-5031, ¶ 49 (6th Dist.), quoting *State v. Fell*, 2012-Ohio-616, ¶ 14 (6th Dist.). The jury, as the finder of fact and the sole judge of the weight of the

66.

evidence and the credibility of the witnesses, may believe or disbelieve all, part, or none of a witness' testimony. *State v. Caudill*, 2008-Ohio-1557, ¶ 62 (6th Dist.), citing *State v. Antill*, 176 Ohio St. 61, 67 (1964). A single witness' testimony, if believed, will support a conviction. *State v. Smallwood*, 2025-Ohio-1001, ¶ 18 (6th Dist.), citing *Toledo v. Manning*, 2019-Ohio- 3405, ¶ 41-42 (6th Dist.), citing *State v. Myers*, 2018-Ohio-1903. ¶ 140-141.

{¶ 217} After careful review of the evidence presented at trial and the credibility of the witnesses, this is not an exceptional case where the evidence weighs heavily against a conviction. The jurors chose to believe the testimony of Garcia and Gingrich implicating Walker despite their history of lying to police. This is within their province as the finder of fact, *Caudill* at ¶ 62, and the court does not find that the jury lost its way in making those credibility determinations.

{¶ 218} Based on the foregoing, Walker's convictions were supported by sufficient evidence and were not against the weight of the evidence and his seventh assignment of error is not well-taken.

**F. Walker was not prejudiced by cumulative errors at trial.**

{¶ 219} Walker's eighth and final assignment of error argues that he suffered prejudice due to the cumulative effect of errors during trial. Under the cumulative error doctrine, "'a judgment may be reversed when the cumulative effect of errors deprives a defendant of his or her constitutional rights, even though such errors are not prejudicial singly.'" *State v. Gilmer*, 2024-Ohio-1178, ¶ 104 (6th Dist.), quoting *State v. Williams*, 2002-Ohio-4831, ¶ 36 (6th Dist.).

67.

{¶ 220} Reviewing Walker's claimed errors, this court did not conclude that there were multiple errors at trial; thus, there can be no cumulative error. *Gilmer* at ¶ 104, citing *State v. Moore*, 2019-Ohio-3705, ¶ 87 (6th Dist.). Walker's eighth assignment of error is not well-taken.

### IV. Conclusion

{¶ 221} On due consideration, the judgment of the Lucas County Court of Common Pleas is affirmed. Pursuant to App.R. 24, Walker is ordered to pay the costs of this appeal.

Judgment affirmed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

| | |
|---|---|
| Thomas J. Osowik | JUDGE |
| Gene A. Zumda | JUDGE |
| Charles E. Sulek<br>CONCUR. | JUDGE |

This decision is subject to further editing by the Supreme Court of Ohio's Reporter of Decisions. Parties interested in viewing the final reported version are advised to visit the Ohio Supreme Court's web site at:
http://www.supremecourt.ohio.gov/ROD/docs/.